*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0224p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 05-3377

KEVIN JEMEL MICKENS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 04-00476—Kathleen McDonald O'Malley, District Judge.

Argued: April 18, 2006

Decided and Filed: July 3, 2006

Before: BOGGS, Chief Judge; SUTTON, Circuit Judge; SCHWARZER, District Judge.[*]

---

## COUNSEL

**ARGUED:** Dennis G. Terez, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for Appellant. Bruce A. Khula, UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Dennis G. Terez, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for Appellant. Bruce A. Khula, UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

---

## OPINION

---

SUTTON, Circuit Judge. Kevin Jemel Mickens challenges his 30-month sentence for possession of counterfeit devices and counterfeit-device-making equipment. In his view, the district court miscalculated the loss from the counterfeit scheme, mixing intended and actual loss in a way that gave him a higher guidelines range than the facts of this case permit. Concluding that the district court's loss calculation was not clearly erroneous, we affirm.

---

[*] The Honorable William W Schwarzer, Senior United States District Judge from the Northern District of California.

1

I.

On August 20, 2004, Lance Arzu entered eight banks in the Ashtabula, Ohio area, seeking to obtain cash advances using fraudulent Discover credit cards. He initially succeeded in obtaining $17,000, usually in $3,500 increments.

Later that day, however, the scheme unwound when employees of the First Merit Bank in Ashtabula, Ohio, became suspicious that Arzu was engaged in fraud and alerted the police. The police arrested Arzu outside of the bank. The police found a fraudulent Discover card on Arzu, bearing the name Shaun Brown, which turned out to be encoded with account information belonging to a (real) Discover customer who lived in California. The police also found a fraudulent driver's license on Arzu, which also bore the name Shaun Brown.

After his arrest, Arzu gave the police information that led to the arrest of his two accomplices, Mickens and India Young. The police also obtained a warrant to search the hotel room where Arzu, Mickens and Young were staying. In the room, they found $15,900 in cash, approximately 35 fraudulent Discover Cards—all in the name of Shaun Brown and all featuring Arzu's picture—and equipment for making fraudulent cards. All of the cards were encoded with the account information of actual Discover customers.

On December 15, 2004, Mickens pleaded guilty to (1) possession of at least 15 counterfeit devices (the cards) in violation of 18 U.S.C. § 1029(a)(3) and § 2 and (2) possession of counterfeit-device-making equipment in violation of 18 U.S.C. § 1029(a)(4). He reserved the right at sentencing to dispute the calculation of the actual or intended loss from the offenses, which the indictment specified at over $120,000.

 At sentencing, the district court accepted the government's calculation that the loss exceeded $120,000, resulting in a 10-level increase in Mickens' guidelines offense level and a guidelines range of 30 to 37 months. On March 15, 2005, the court sentenced Mickens to 30 months' imprisonment, which he now appeals. We review a district court's loss calculation under the sentencing guidelines for clear error, *United States v. Sosebee*, 419 F.3d 451, 455 (6th Cir. 2005), and a challenge to the district court's sentence for reasonableness, *see United States v. Morris*, 448 F.3d 929, 930 (6th Cir. 2006).

II.

Section 2B1.1 of the sentencing guidelines explains how to calculate losses arising from counterfeiting offenses. It sets a base offense level of six for Mickens' counterfeiting offenses, U.S.S.G. § 2B1.1(a)(2), then requires an increase in the offense level based on the loss resulting from the crime—with a loss of more than $30,000 increasing the offense level by six, a loss of more than $70,000 increasing it by eight and a loss of more than $120,000 increasing it by ten. U.S.S.G. § 2B1.1(b)(1)(D)–(F).

The commentary to § 2B1.1 says that "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, cmt. n.3(A). It then defines actual loss as "the reasonably foreseeable pecuniary harm that resulted from the offense" and intended loss as "the pecuniary harm that was intended to result from the offense . . . includ[ing] intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)." *Id*. cmt. n.3(A)(i) & (ii). We have previously held (in an unpublished opinion) that the total loss "amount may include both actual and intended losses where the fraud involved both successful and ultimately unsuccessful attempts." *United States v. Gross*, 84 Fed. App'x 531, 533 (6th Cir. 2003). "The intended loss necessarily includes all actual losses, because actual loss is merely a loss that [the defendant] intended to inflict and *did* inflict." *United States v. Tate*, 136 Fed. App'x 821, 826 (6th Cir. 2005); *see also United States v. Carboni*, 204 F.3d

39, 47 (2d Cir. 2000) ("Logically, intended loss must include both the amount the victim actually lost and any additional amount that the perpetrator intended the victim to lose.").

The commentary also explains that the district court may consider "[t]he approximate number of victims multiplied by the average loss to each victim" in making its loss calculation. U.S.S.G. § 2B1.1, cmt. n.3(C)(iii). To use one example from the case law, if the counterfeit scheme involved 600 cloned cell-phone identification numbers and the defendants, using 156 of those numbers, defrauded customers and companies of $456,632 (or approximately $3000 per cloned phone), the court may multiply the per-phone average loss over the remaining unused phones and add it to the actual loss, increasing the actual and intended loss to approximately $2 million. *See United States v. Watson*, 118 F.3d 1315, 1319 (9th Cir. 1997); *see also United States v. Chernoff*, Nos. 92-2844, 92-3040, 92-3083, 92-3093, 92-3348, 1994 U.S. App. LEXIS 8399, at *20 (7th Cir. Apr. 19, 1994) (concluding that where $135,000 in actual loss was established for 250 fraudulent phone cards, $270,000 in additional loss could be established for 500 unused phone cards for a total loss of approximately $400,000); *cf. United States v. Lin*, 410 F.3d 1187, 1191–93 (10th Cir. 2005) (estimating intended loss in credit card fraud by aggregating the limits on the unused credit cards). The commentary, finally, notes that the district court "need only make a reasonable estimate of the loss. . . . based on available information." U.S.S.G. § 2B1.1, cmt n.3(C); *see also United States v. Rothwell*, 387 F.3d 579, 583 (6th Cir. 2004).

On appeal, the government offers two ways of calculating the loss arising from this counterfeit scheme, both of which (it says) establish that the district court did not commit clear error in calculating the loss at over $120,000. Under one method, the government initially totals all of the losses experienced by customers and banks as a result of the credit-card fraud perpetrated by Mickens and his accomplices—$48,802.87. It then adds that number to the likely intended loss, which the government estimates by multiplying the 35 credit cards recovered from the hotel room by $3000 (one estimate of the average amount the defendant and his accomplices were trying to obtain from cash advances on the day they were arrested). The total, $153,802.87, qualifies Mickens for a 10-point offense-level increase.

We would have no problem affirming this approach if the record established that all of the forged credit cards seized from the hotel room were unused. But as we read the record, it remains unclear whether the $48,802.87 in actual losses under this calculation involved any of the cards seized from the hotel room or whether that figure reflects only previously used and discarded cards. If the former is true—if the $48,802.87 figure involved some of the seized cards—that would suggest that the calculation involved forbidden double counting because it would encompass the actual money Mickens and his accomplices took using some cards and an estimate of intended loss from those same cards. Unable to resolve this ambiguity in the record and unable to determine whether any double counting was harmless (because it still would have left Mickens with over $120,000 in loss), we cannot endorse this theory of loss calculation.

The presentence report offers a second method of calculating loss, one that adequately accounts for this concern. The report adds the cash found in the hotel room, $15,900, to an estimate of what Mickens and his accomplices could have obtained with the cards left in the hotel room—32 cards (a number conceded by Mickens' counsel) multiplied by an estimate of the average fraud from the fraudulent transactions on August 20, 2004, namely $3500. The result, $127,900, also qualifies Mickens for a 10-point offense level increase. One can fairly infer that the $15,900 used in the report corresponds to what remained of the $17,000 successfully taken from the Ashtabula area banks on August 20, 2004. And the estimate of $3500 corresponds to the amount received in almost all of the successful cash advances Mickens and his accomplices completed on that date. At oral argument, moreover, Mickens' attorney acknowledged that the 32 cards found in the hotel room (and mentioned in the police report) were not used on August 20, 2004. Finally, with respect to this calculation, at any rate, the defendant does not argue that double counting occurred. As a "court

need only make a reasonable estimate of the loss, given the available information," *United States v. Brawner*, 173 F.3d 966, 971 (6th Cir. 1999), we believe that this estimate does not amount to clear error. *See* JA 90 (district court "find[ing] that the probation officer's calculations are correct"); *id.* (district court reasoning that the "calculation . . . is consistent with the pattern of activity by these defendants[,] is . . . appropriate and . . . accurately predicts the intended loss by these defendants if left to their own devices and if law enforcement had not stopped the use of the numerous illegal devices which were in their possession").

While this approach resolves some of Mickens' arguments on appeal, it does not resolve all of them. Noting that the commentary says that loss is "the greater of actual loss or intended loss," U.S.S.G. § 2B1.1, cmt. n.3(A), Mickens argues that the court may not rely on actual *and* intended loss in making its calculation. That may be true, in one sense, but it does not follow that the sentencing court may not account for the actual loss that occurred in calculating the intended loss—so that the intended loss includes all actual losses resulting from the defendants' scheme and all reasonably foreseeable losses that would have resulted from the defendants' scheme had the police not cut it short. As we have reasoned before in rejecting a similar argument, "[t]he intended loss necessarily includes all actual losses, because actual loss is merely a loss that [the defendant] intended to inflict and *did* inflict." *Tate*, 136 Fed. App'x at 826. "Logically, intended loss must include both the amount the victim actually lost and any additional amount that the perpetrator intended the victim to lose." *Carboni*, 204 F.3d at 47. What the guidelines prohibit is not a calculation of intended loss that accounts for all actual losses already incurred; they prohibit, as explained above, a calculation that without explanation double counts the actual loss resulting from one instrument of the fraud (here, a fraudulent credit card) and the potential intended loss from the same instrument of the fraud (here, the same fraudulent credit card, as opposed to an unused fraudulent credit card).

Mickens next argues that *United States v. Booker*, 543 U.S. 220 (2005), bars district courts from applying a preponderance standard in finding facts at sentencing. But he has much to overcome in making this argument: By now, it is well established that the preponderance standard does not violate *Booker*, so long as the trial court appreciates that the guidelines are advisory, not binding. *See United States v. Green*, No. 05-3786, 2006 U.S. App. LEXIS 11783, at *4–9 (6th Cir. May 12, 2006); *United States v. Anglin*, 169 Fed. App'x 971, 973 (6th Cir. 2006); *United States v. Rodriguez-Ruiz*, Nos. 04-1697, 04-1754, 2005 U.S. App. LEXIS 27874, at *14 (6th Cir. Dec. 14, 2005); *United States v. Vaught*, 133 Fed. App'x 229, 233 (6th Cir. 2005); *see also United States v. Vaughn*, 430 F.3d 518, 521 (2d Cir. 2005); *United States v. Price*, 418 F.3d 771, 788 (7th Cir. 2005).

Mickens, lastly, argues that his sentence is unreasonable because the sentencing court did not sufficiently account for the factors identified in 18 U.S.C. § 3553(a). In reviewing similar claims, we have observed that a court "need not recite [the § 3553(a)] factors but must articulate its reasoning in deciding to impose a sentence in order to allow for reasonable appellate review." *United States v. Kirby*, 418 F.3d 621, 626 (6th Cir. 2005).

The district court satisfied this standard. The court was well aware that ultimate sentencing authority rested with the sentencing court, not the guidelines. *See* JA 97 ("[T]he Court understands the scope of its discretion. The court is certainly not a slave to the guidelines . . . ."). In determining that a "sentence within the guideline range is appropriate," *id.*, the court accounted for the § 3553(a) factors in the following ways: The court considered that Mickens had no previous fraud-related convictions and surmised that he had been unduly influenced by his relationship with Young; it reduced his sentence to make it similar to Young's in an effort to recognize that Mickens may have been led to this crime rather than the initiator of it; it noted that but for the intervention of law enforcement, Mickens and his accomplices "would have continued their illegal activity and would have caused substantially more losses to substantially more . . . victims," JA 98; it noted that "the

one place where it's clear the guidelines are not unduly harsh is in fraud-type convictions like this," JA 113; and it concluded that "[t]he range for this defendant is completely reasonable, and the Court finds no basis not to stay within it," *id.* While the court did not parrot each of the § 3553(a) factors, it adequately explained the basis for its ruling. *See Kirby*, 418 F.3d at 626.

III.

For these reasons, we affirm.