**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0568n.06
Filed: August 8, 2007

**No. 06-2247**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| DANIEL M. KORSON, | ) | WESTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |

Before: RYAN, DAUGHTREY, and ROGERS, Circuit Judges.

PER CURIAM. In this sentencing appeal, defendant Daniel Korson contends that the district court relied upon impermissible factors in departing upward from the guidelines range calculated in the defendant's presentence report, improperly relied on victim-impact statements made at his sentencing hearing, and violated Federal Rule of Criminal Procedure 32(h) by failing to give the defendant notice of the specific grounds upon which the upward adjustment would be based. For the reasons set out in this opinion, we find no reversible error in connection with the sentencing procedure, and we therefore affirm the sentence imposed by the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

Korson was a CPA with his own accounting firm in Muskegon, Michigan, and, through his business, he became employed as financial director or manager of several local non-profit organizations, including Muskegon Family Care, a community health center serving mostly poor and under-served patients; Greater Muskegon Catholic Schools, an organization of four Catholic schools located within the Muskegon area; and Catholic Social Services of Muskegon, a Catholic Charities organization providing various charitable services. In his capacity as financial director of these organizations, Korson was responsible for all the financial functions of each organization, including budget preparation, auditing procedures and preparing operating and cash-flow reports.

Over a five year period, the defendant embezzled $2,265,417.50 in connection with his position as financial director of Muskegon Family Care, Greater Muskegon Catholic Schools, and Catholic Social Services of Muskegon. According to the pre-sentence report, most of this amount, $1,394,910.00, was taken from Muskegon Family Care; $170,000.00 was taken from Catholic Social Services; and $655,653.91 consisted of withholding tax payments owed but not turned over to the IRS and $44,853.60 represented state withholding tax payments. Because these tax payments belonged to the IRS and the State of Michigan, the victims who suffered monetary loss with regard to those amounts were the government entities themselves rather than Greater Muskegon Catholic Schools, from whose accounts the money was stolen.

Of the funds embezzled, Korson used $553,906.00 to shore up the finances of two restaurants that he owned and used the remainder to pay the bills and other financial obligations of Greater Muskegon Catholic Schools. Korson, who grew up in Muskegon and was closely connected to the Muskegon Catholic community personally and through his family, explained that he felt responsible for the financial success or failure of the Greater Muskegon Catholic Schools and decided to help the school system by taking money from Muskegon Family Care, viewing the embezzlement as moving money from a financially-sound institution to a financially-unsound institution. He claimed that he intended to return the money to Muskegon Family Care after he implemented a plan that would create financial stability in the school system, and he purportedly kept an account of how much money he took and where it went in order to repay the amounts accurately. With regard to the money he diverted to support his restaurants, he said that he hoped to make the businesses successful, allowing him to repay the money taken with interest. However, the restaurants ultimately failed and went into bankruptcy.

Korson funneled all of the embezzled funds through a Greater Muskegon Catholic Schools bank account known as the "50/50 account" (because the money from 50/50 fund-raising raffles was held in that account). To effect the embezzlement and to cover it up, he falsified numerous documents over the five-year period, including altering letters from the State of Michigan, generating fake letters, altering journal entries, and creating false monthly, quarterly and annual reports for several of the organizations.

During the time Korson was siphoning funds from Muskegon Family Care to the 50/50 account, the medical center began facing budget shortfalls. As a result, Korson wrote a letter to the finance committee identifying their financial shortfalls and advising committee members that they needed to generate an operational surplus of $170,000 within the next six months. In the letter Korson also addressed ways in which to accomplish this and suggested increasing patient visits to generate income, freezing all the management and provider salary increases planned for the rest of the fiscal year, and restructuring certain management positions so that the time commitment (and therefore pay) would be less.

Following his arrest and indictment, Korson executed a plea agreement with the government and pleaded guilty to two counts: embezzlement of federal program funds, in violation of 18 U.S.C. § 666(a)(1)(A), and embezzlement of public funds, in violation of 18 U.S.C. § 641. The presentence report calculated the offense level to be 21, derived from a base offense level of 6, a 16-level increase because the monetary loss was between $1 million and $ 2.5 million, a three-level decrease for acceptance of responsibility, and a two-level increase pursuant to U.S.S.G. § 3B1.3 for abuse of a position of trust or use of special skill to commit the offense. Korson did not have a criminal record, so a criminal history category of I was used to arrive at a recommended guideline range of 37 to 46 months. The presentence report indicated that "[n]o factors ha[d] been identified under 18 U.S.C. § 3553(a) that would warrant the Court sentencing the defendant outside the advisory guideline range." However, in an addendum, the

probation officer who wrote the report noted that the government would argue that an upward variance was warranted.

The presentence report also included a "victim impact" section that listed Muskegon Family Care, Muskegon Catholic Social Services, the IRS, and the State of Michigan as victims. Over four pages of this section were dedicated to explaining that although Greater Muskegon Catholic Schools did not suffer an actual monetary loss (and presumably therefore was not listed as a "victim"), Korson's embezzlement nonetheless had a devastating effect on the school system, based on the probation officer's interview with the attorney for Greater Muskegon Catholic Schools, who in turn had spoken with Mary O'Connor, the Executive Director of Greater Muskegon Catholic Schools Foundation, as well as a statement directly from Mary O'Connor. The report explained that because the true financial condition was masked for over five years, the school system was unable to take appropriate remedial steps and was therefore facing an unexpected crisis. One school had already closed, others were in danger of closing, tuition had been raised 10 percent, 11 employees had been laid off, staff wages were frozen, and the school board was at that point contemplating the elimination of healthcare coverage for teachers' families. The schools had traditionally been substantially supported by donations from a small number of very generous individuals, but due to Korson's criminal activities, one of these donors had suspended a customary annual donation of $100,000, and others became reluctant to contribute. Moreover, because the schools' credit was damaged as

a result of Korson's actions, vendors had threatened to discontinue services and some vendors had reverted to cash-only deliveries.

The victim impact statement from Mary O'Connor was reproduced in full in the presentence report. In addition to discussing the hardships the schools were then facing, O'Connor discussed the significant personal stress that the financial crisis had caused her, as well as the toll it had taken on her and her family from working nights and weekends in order to "straighten out the mess [Korson] made." She also explained that because Korson was a long-standing and esteemed member of the community who had a long history with the Muskegon Catholic schools, the schools put an inordinate amount of trust in Korson, likening it to "the trust we Catholics give priests." The overall theme of O'Connor's letter was that although Korson is now presenting himself as a Robin Hood figure, his actions were extremely hurtful to the school and those associated with the schools. She also expressed her disbelief that he was truly trying to help the schools, calling his conduct "blatant evil."

The presentence report also discussed victim impact on Catholic Social Services and Muskegon Family Care, but in less detail. With regard to Muskegon Family Care, the probation officer reported:

> Victim impact letters were also received from representatives and employees of Muskegon Family Care. The letters confirmed the amount of loss detailed in the presentence report. Letters explain the financial and social impact Mr. Korson's conduct has had on the organization as well as its employees.

> Many employees reference staff cuts as well as extensive expense and productivity scrutiny as a result of his crime. Others reference the impact his crime has had on community relations and funding for Muskegon Family Care. Some employees were forced to find new employment based on lack of funding in their departments. All letters referenced a request that the Court sentence Mr. Korson to the full extent the law allows.

At the ensuing sentencing hearing, three representatives from Muskegon Family Care made victim impact statements. They described the financial strain that the organization had been under at the time Korson had embezzled the funds because of capital outlays for a new building. The severe budget shortfalls that followed were caused in large part by Korson's embezzlement and resulted in pay freezes, discontinuation of training programs, damage to morale in general, and a feeling of betrayal the staff felt when they realized what Korson had done. Moreover, all three witnesses stressed that Korson's crime was all the more heinous because Korson was well aware that the center's mission was to serve the poor and neglected in society. One witness said that with the funds that Korson stole, at least 2,500 more patients could have been treated. All three witnesses voiced the hope that the court would punish Korson to the greatest extent allowed. As one witness put it, "I ask this court to send a message to our patients . . . that their struggles are not unheard and they are not unseen. Send a message that this state and this country will not tolerate opportunists who take advantage of the poor for their own personal gain."

In its sentencing memorandum filed in advance of the sentencing hearing and at the hearing, the government conceded that the sentencing range had been accurately calculated by the probation officer but requested either an upward departure pursuant to U.S.S.G. § 5K2.0 or, in the alternative, an above-the-guidelines variance pursuant to 18 U.S.C. § 3553(a). The government contended that because the guidelines calculation addressed monetary harm only, the damage Korson's crime had caused to Greater Muskegon Catholic Schools, which was all non-monetary in nature, had not been taken into account and, therefore, that a departure or variance was necessary in order to punish the defendant adequately for his crimes. At the hearing, the government reiterated this argument and also referred to the monetary and non-monetary harm to Muskegon Family Care, emphasizing the victim impact statements that had just been presented and suggesting a four-level increase, based on the "yardstick" of the four-level enhancement provided for in U.S.S.G. § 2B1.1(b)(13)(B)(ii) and (iii) for harm endangering the financial security of a publicly traded organization or an organization with over 1,000 employees, and harm endangering the solvency of more than 100 victims, respectively. It is clear, however, that the government was citing § 2B1.1(b)(13)(B) only as an example of an appropriate increase for similar conduct and not as mandatory in the defendant's case.

In his sentencing memorandum, as well as at the hearing, the defendant objected to an upward adjustment, arguing that the non-monetary harm to Greater Muskegon Catholic Schools had already been taken into account. He argued that every

embezzlement necessarily affects people "down the line" in non-monetary ways and, therefore, that the guidelines already take these effects into account when they set the base offense levels. The defendant also argued that the two-level enhancement he had received for abuse of a position of trust or use of special skill, pursuant to U.S.S.G. § 3B1.3, specifically took non-monetary harm into account. Therefore, he contended, a sentence above the guidelines would, in effect, count the non-monetary factors twice and create a sentencing disparity in relation to other embezzlement cases. The defendant also insisted that the description of the non-monetary harm to Greater Muskegon Catholic Schools was based on mere "anecdotal reports" of school representatives and was not the result of investigation. Korson also argued that although the Catholic school system was trying to blame him for its financial problems, it was experiencing financial problems unrelated to his criminal activities and similar to financial problems that Catholic schools across the country were experiencing. At no time did the defendant object to the victim-impact statements given by the Muskegon Family Care representatives.

At the hearing, the court went through the factual assertions as stated in the presentence report, and each time the non-monetary harm to Greater Muskegon Catholic Schools was raised, the judge acknowledged Korson's position that it was overstated and based on anecdotal evidence. After a thorough discussion of the presentence report, argument by counsel, and a statement from the defendant himself, the court went over the § 3553(a) factors in detail. The district judge was particularly cognizant of the fact that

because of his history with the community and his social skills, Korson was "able to lead people to a level of trust which they may not otherwise have had." The judge also noted that Korson was a "key person in the community" and that the trust people placed in him was beyond that that would be given to "just somebody who was any accountant." After acknowledging that factors had been taken into account to some extent in the guidelines calculation in the § 3B1.3 enhancement, the district judge concluded that the defendant's situation was "bigger than that." Moreover, the district judge found, Korson's conduct was not spontaneous but, instead, involved careful planning over a five-year period and repeated acts of deceit involving innocent people who "[didn't] really understand what [wa]s going on," presumably because the organizations had placed such an inordinate amount of trust in Korson and, as a result, had not thought to audit his accounting. The judge described the total amount of the monetary loss as "egregious" and also accepted the government's argument that there was substantial non-monetary harm that was not taken into account under the guidelines, including the fact that much of the money embezzled was earmarked for the medical needs of the poor. In addition, the judge was clearly dubious about the defendant's "Robin Hood" motivations, based on the evidence in the record.

As a result, the district judge concluded that a four-level enhancement was required in order to "take into account the factors that our guidelines simply don't recognize that are real in this case." That increase took the offense level to 25, resulting in a guideline range

of 57 to 71 months.  Ultimately, the district judge imposed a sentence of 60 months, finding

that "a five-year sentence . . . [is] a long time" but "[not] too long for this offense" and

concluding that it was both "reasonable" and "adequate."  The judgment entered by the

district court adopted the recommendation in the presentence report, with the following

notation:

> Defendant substantially endangered the solvency and financial security of
> several organizations.  Moreover, the harm done to the Greater Muskegon
> Catholic Schools cannot be measured by the guidelines because the
> applicable guideline measures only economic harm.  The Court gave a 4-level
> enhancement to the base offense level calculations pursuant to 5K2.0;
> similarly to U.S.S.G. § 2B1.[1](b)(13)(B)(ii) and U.S.C. § 3553(a)(2)(A).

The judgment also provides that the sentence outside the guideline was necessary "to

reflect the seriousness of the offense, to promote respect for the law, and to provide just

punishment for the offense (18 U.S.C. § 3553(a)(2)(A))."  The defendant now appeals the

sentencing order as reflected in the district court's judgment.

## II.  DISCUSSION

### A.  Standard of Review

In the wake of the Supreme Court's decision in *United States v. Booker*, 543 U.S.

220 (2005), sentencing courts must consider not only the applicable sentencing guideline

range but also the statutory factors set out in 18 U.S.C. § 3553(a), in arriving at a sentence

that is sufficient but not greater than necessary to meet the goals set out in section 3553(a).

Those factors include "the nature and circumstances of the offense;" "the history of the defendant;" "the need for the sentence imposed . . . to reflect the seriousness of the offense[,] . . . to afford adequate deterrence to criminal conduct[,] . . . to protect the public from further crimes of the defendant[, and] . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;" "the need to avoid unwarranted sentence disparities. . . ; and the need to provide restitution . . . ." 18 U.S.C. § 3553(a). If a sentence falls within the advisory guidelines range, then we accord it "a rebuttable presumption of reasonableness." *United States v. Richardson*, 437 F.3d 550, 553 (6th Cir. 2006) (internal quotation marks and citation omitted); *see also Rita v. United States*, 127 S.Ct. 2456, 2462-63 (2007) (federal appellate court may apply a non-binding presumption of reasonableness to district court sentence that falls within properly calculated guidelines range).

We review the district court's sentencing orders for procedural and substantive "reasonableness." *See United States v. Collington*, 461 F.3d 805, 807-08 (6th Cir. 2006). A sentence is considered procedurally "unreasonable when the district judge fails to 'consider' the applicable Guideline range or neglects to 'consider' the other factors listed in 18 U.S.C. § 3553(a) and instead simply selects what the judge deems an appropriate sentence without such required considerations." *United States v. Webb*, 403 F.3d 373, 383 (6th Cir. 2005) (footnote omitted). In addition, "a sentence may be substantively unreasonable where the district court 'select[s] the sentence arbitrarily, bas[es] the sentence

on impermissible factors, fail[s] to consider pertinent § 3553(a) factors, or giv[es] an unreasonable amount of weight to any pertinent factor." *United States v. Ferguson*, 456 F.3d 660, 664 (6th Cir. 2006) (quoting *Webb*, 403 F.3d at 385) (alterations in *Ferguson*).

## B. Double-Counted or Otherwise Impermissible Factors

The defendant first argues that his sentence was "improperly enhanced by four levels" based on several factors that were either "double-counted" or impermissible, specifically abuse of a position of trust, non-monetary harm to Greater Muskegon Catholic Schools, and victim impact on Muskegon Family Care, including the fact that the patients affected by the embezzlement were mostly poor and underserved. Our review of the record, however, convinces us that none of these factors was double-counted or given undue weight and that no impermissible factor was considered.

Concerning the abuse-of-trust factor, the defendant argues that double-counting resulted from the two-point enhancement under U.S.S.G. § 3B1.3 coupled with the fact that embezzlement necessarily involves an abuse of trust. We have held, however, that abuse of trust is not a necessary element of embezzlement, and therefore the defendant's sentence may be enhanced for such an abuse pursuant to § 3B1.3. *See United States v. Madison*, No. 05-5622, 2007 WL 1120382, at * 12 (April 16, 2007) (unpublished) (citing *United States v. Brown*, 66 F.3d 124, 129 (6th Cir. 1995)). Moreover, while the defendant is correct in asserting that his sentence was enhanced even beyond the limits of section

3B1.3, the guidelines specifically allow for upward departures when the circumstance that forms the basis of the departure "is present in the offense to a degree substantially in excess of . . . that which ordinarily is involved in that kind of offense." *See* U.S.S.G. § 5K2.0(a)(3). There is ample evidence in the record that the defendant was given an inordinate amount of trust by the organizations that hired him, especially the Catholic school system, due to his long history and prominence in the Muskegon community, and the district judge specifically held that Korson's abuse of trust was more egregious than that taken into account under § 3B1.3.

The defendant's contention that non-monetary harm to both Greater Muskegon Catholic Schools and Muskegon Family Care was likewise impermissibly double-counted is equally unpersuasive. He argues that under the guidelines, the dollar-amount of the loss is an adequate measure of the harm caused and, therefore, that the guidelines implicitly accounted for any non-monetary harm through the 16-level increase to his base offense level for the total pecuniary loss he caused to his victims, citing commentary to the 2003 amendments to the loss table in U.S.S.G. § 2B1.1. But that table was amended in 2003 to increase the penalties for offenses that cause "catastrophic losses of magnitudes previously unforeseen, such as the serious scandals that gave rise to several portions of the Act [which contained the amendment]". *See* U.S.S.G. § 2B1.1, app. C (am. 647). Although the amount of loss in this case was large, it did not constitute a "catastrophic loss of great magnitude" as contemplated by the commentary, which speaks in terms of losses in excess

of $200 million and $400 million but makes no mention of non-monetary losses. Moreover, contrary to Korson's contention that the § 2B1.1 chart accounts for non-monetary loss, the Application Notes to § 2B1.1 specifically provide that any "caused or risked substantial non-monetary harm" such as "psychological harm or severe emotional trauma" is a valid upward-departure consideration. *See* U.S.S.G. § 2B1.1, cmt. n. In this case, there was ample evidence that non-monetary harm was inflicted on both Greater Muskegon Catholic Schools and Muskegon Family Care, including morale problems, negative community relations, and an emotional toll on those left to clean up the mess that resulted from Korson's long-running deception, all of which the district judge found compelling.

With regard to the § 5K2.0 "aggravating factor" that much of the money taken from Muskegon Family Care was earmarked for the medical needs of the poor, the defendant contends that it was an impermissible ground upon which to base the departure because the medical center was not a "vulnerable victim" within the meaning of the guidelines. In support of this proposition, the defendant cites out-of-circuit case law indicating that a vulnerable-victim enhancement under U.S.S.G. § 3A1.1 may be used only if the defendant targeted his victims because of their vulnerability, which the defendant denies doing. However, it does not appear that the district court relied on § 3A1.1 in imposing sentence. Moreover, under the framework for § 5K2.0 departures set out by the Supreme Court in *Koon v. United States*, 518 U.S. 81 (1996), this circumstance is exactly the kind of consideration that is ripe for a departure because this fact, perhaps more than any other,

makes Korson's case egregious in comparison to other embezzlement cases and, therefore, takes the case "outside the Guidelines 'heartland' and make[s] . . . it a special, or unusual, case." *Id.* at 95.

## C. Judicial Fact-Finding

Despite his failure to object to the victim impact statements when they were made at the sentencing hearing by witnesses appearing on behalf of Muskegon Family Care, the defendant now argues that the district court's consideration of them violated his Sixth Amendment rights as interpreted in *United States v. Booker*, 543 U.S. 220 (2005), on the ground that the statements included facts that had not been found by a jury or admitted by the defendant. Because Korson did not raise this issue below, we review only for plain error. *See United States v. Barnett*, 398 F.3d 516, 525 (6th Cir. 2005).

Pursuant to Federal Rule of Criminal Procedure 52(b), "a plain error that affects substantial rights may be considered even though it was not brought to the court's attention." An appellate court must find "(1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. Meeker*, 411 F.3d 736, 741 (6th Cir. 2005) (citing *Johnson v. United States*, 520 U.S. 461, 466-67 (1997)) (internal quotation marks omitted). Generally, to show that substantial rights are adversely affected, the defendant "must demonstrate prejudice as a result of the error." *Id.* at 741-42 (citing *United States v. Olano*, 507 U.S. 725, 734-35 (1993)) (internal quotation marks omitted). Finally, even where all

three conditions are met, "an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 741 (citing *Johnson*, 520 U.S. at 467) (internal quotation marks omitted).

There is no plain error in this case because there was no error. We have reiterated in the wake of *Booker* that the holding in that case did not eliminate judicial fact-finding. *See*, *e.g.*, *United States v. Mickens*, 453 F.3d 668, 673 (6th Cir.) (no Sixth Amendment violation when sentencing guidelines are considered merely advisory), *cert. denied*, 127 S.Ct. 540 (2006). On the contrary, at post-*Booker* sentencing a judge may enhance a sentence based on judicially-found facts as long as those facts are found by a preponderance of the evidence. *See id.* Moreover, there is no merit to the defendant's belated claim, raised only in his reply brief before this court, that facts culled by the district court from the victim-impact statements did not meet the preponderance of the evidence standard, both because Korson admitted the essential facts discussed in the statements and because he has failed to show that any of the facts presented in the statements and relied upon by the court were established by anything less than a preponderance of the evidence. His main complaint appears to concern the emotional tenor of some of the testimony. But there is nothing in the record to indicate that the district judge was influenced by the emotional nature of the victim-impact statements. Indeed, the court's explanation for the sentence appears to be appropriately well-reasoned and dispassionate,

setting out the basis for the upward departure and an analysis of the relevant § 3553(a) factors.

## C. Federal Rule of Criminal Procedure 32(h)

In another argument focusing on the victim-impact statements of the Muskegon Family Care representatives, the defendant contends that the district court violated the notice requirement of Federal Rule of Criminal Procedure 32(h) by basing its decision to impose an enhancement at least in part on harm to Muskegon Family Care, as recounted in the in-court statements, even though the presentence report and the government's prehearing submissions mentioned only non-economic harm to Greater Muskegon Catholic Schools as the basis for a departure or variance. Because Korson failed to raise this objection at the sentencing hearing, our review once again is for plain error only. In this instance, we conclude that any error on the part of the district court was harmless, because the defendant has failed to establish prejudice.

Rule 32(h) provides that:

> Before the court may depart from the applicable sentencing range on a ground not identified for departure either in the presentence report or in a party's prehearing submission, the court must give the parties reasonable notice that it is contemplating such a departure. The notice must specify any ground on which the court is contemplating a departure.

This provision was added to Rule 32 by amendment in 1996 in order to codify the Supreme Court's holding in *Burns v. United States*, 501 U.S. 129, 135 (1991), that the guarantee in Rule 32 of the defendant's right "to comment upon . . . matters relating to the appropriate sentence" necessarily included the right to notice of a court's intent to depart upward and the grounds for such a departure. But in this case, the subject of the defendant's complaint is the court's consideration of the victim-impact statements, which came to light only at the sentencing hearing. Given this circumstance, we do not see how it would be possible for the district court to supply the prehearing notice referenced by Rule 32(h).

Moreover, we reject the defendant's contention that without such notice, the victim-impact statements made by the Muskegon Family Care representatives at the hearing were "not properly before the court." The defendant relies on our decision in *United States v. Hayes*, 171 F.3d 389 (6th Cir. 1999), to support his argument. The situation in that case, however, is distinguishable from the situation we find here. In support of his decision to sentence the defendant to the high-end of the applicable guidelines range, the sentencing judge in *Hayes* relied extensively on victim-impact letters that were sent directly to the court and were never made available to the defendant. Indeed, the defendant was not even aware that the letters existed prior to imposition of the sentence. Reviewing for plain error, we found that it was error for the judge to rely on the undisclosed, *ex parte* letters in making his sentencing determination and that the error met the stringent standards of a plain error analysis.

Here, by contrast, the defendant had notice that representatives of Muskegon Family Care had sent letters to the probation officer during his presentence investigation describing "the financial and social impact [the defendant]'s conduct has had on the organization as well as its employees," including strained finances requiring "staff cuts," adverse effects on "community relations," and difficulties in fund-raising. Because the defendant was put on notice that "[s]ome employees were forced to find new employment based on lack of funding in their departments," he could reasonably anticipate that the laid-off employees and others from the medical center might appear at the sentencing hearing and ask to give statements in open court, as was their right under the Crime Victim's Rights Act. *See* 18 U.S.C. § 3771(a)(4). No legal authority of which we are aware would require that a sentencing court simply ignore such statements.

There was in this case no contemporaneous objection to testimony by the medical center representatives at the sentencing hearing. Nor was there a motion to continue the hearing in order to permit counsel to investigate the information presented on behalf of Muskegon Family Care. In view of the notice in the presentence report that the organization's officials were concerned about more than just the bottom-line loss of well over $1 million due entirely to the defendant's perfidy, we simply cannot conclude that plain error occurred in this case. Significantly, the defendant has not alleged that any particular factual assertion put forward in the victim-impact testimony was false, nor has he demonstrated on appeal in what way he would have been able to rebut those assertions

effectively, had he known that they would be offered.  As a result, he has failed to establish the prejudice necessary to prevail under Rule 32(h).  *See Meeker*, 411 F.3d at 742-43, 746 (in challenging a sentence for lack of Rule 32(h) notice, a defendant must demonstrate on appeal what advantage he would have gained from receiving prehearing notice, *i.e.*, that factual assertions were false or could have been effectively rebutted).

## **CONCLUSION**

For the reasons set out above, we AFFIRM the district court's judgment.