**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0288n.06

No. 09-5506

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**May 03, 2011**
LEONARD GREEN, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF KENTUCKY |
| LLOYD T. NAPIER, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

Before: COLE and GIBBONS, Circuit Judges; CLELAND, District Judge.[*]

CLELAND, District Judge. Lloyd Napier appeals his 180-month sentence for conspiracy to distribute oxycodone. Specifically, Napier challenges as erroneous the district court's factual finding—and the resultant two-level increase to the offense level—that he could have reasonably foreseen that his father, coconspirator Mack Napier, possessed firearms in connection with the conspiracy. The father, according to uncontradicted information, was known to have had a concealed weapons permit for years, said to be "frequently armed," a man who "keeps a .38 handgun on his person at all times." Indeed, when the search warrant was executed, he was found sleeping with a loaded handgun by his side. Several other loaded and unloaded firearms were in the same bedroom. We **AFFIRM**.

---

[*] The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

No. 09-5506
*USA v. Napier*

## I.  BACKGROUND

On October 2, 2008, Napier pleaded guilty to Counts 1 and 7 of a  June 26, 2008, Indictment. Count 1 charged Napier, his father, and Jarrett Stepp with conspiracy to knowingly and intentionally distribute a quantity of pills containing oxycodone, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(l) and 21 U.S.C. § 846.  (Indictment, Dist. Ct. Docket No. 1, at 1.)  The Indictment alleged the dates of the conspiracy to be from approximately January 2006, the exact date unknown, and continuing through approximately March 4, 2008.  (*Id.*)  Count 7 alleged that certain property was subject to forfeiture under 21 U.S.C. § 853 because Napier and his coconspirators used and intended to use the described property to commit and facilitate the controlled substance violations, and the described property constituted and is derived from proceeds obtained directly or indirectly as a result of the commission of the violations of 2l U.S.C. §§ 846 and 84l(a)(l).  (*Id.* at 3-4.)  The forfeiture count listed a money judgment, various amounts of currency, two vehicles, and eight firearms.  (*Id.* at 4.)

The written plea agreement set forth the factual basis of the plea and provided that Napier's father began selling oxycodone in 2006, but, despite being aware of his father's activities, Napier did not begin to personally buy and sell oxycodone until November 2007.  (Plea Agreement, Dist. Ct. Docket No. 77, at 1-2.)  During the conspiracy, Napier traveled to Michigan and Ohio on at least four occasions in order to obtain more pills for his father.  (*Id.* at 2.)  During each trip, Napier purchased between $50,000  and $100,000 worth of oxycodone tablets and transported them back to the Eastern District of Kentucky for distribution. (*Id.*)  The written agreement further stated that

No. 09-5506
*USA v. Napier*

from November 2007 through February 2008, Napier received and sold approximately 200 80-mg oxycodone tablets per day, and that a total of 15,000 80-mg oxycodone tablets were reasonably foreseeable to Napier over the course of the conspiracy. (*Id.*)  The parties agreed that all seized tablets were properly tested and confirmed to be oxycodone.  (*Id.*)

Prior to sentencing, a presentence report was prepared.  The presentence report detailed the facts surrounding the offense conduct, including the origins of the investigation of the offense.  On July 19, 2007, Harlan County Sheriff's Department officials interviewed Shonda Middleton, an inmate who was in custody for oxycodone trafficking.  (Presentence Report at 5.)   Middleton informed officials that Jarrett Stepp was her supplier of oxycodone pills and that Stepp had told Middleton that Mack Napier was his supplier.  (*Id.*)  On November 27, 2007, Drug Enforcement Administration officials met with a "source of information," who stated he bought oxycodone from Mack Napier.  The source also stated that "Mack Napier keeps a .38 handgun on his person at all times and has several guns in his residence."  (*Id.*)  The report gave further details of the investigation, which culminated in the execution of a search warrant on March 4, 2008, at the residence of Napier's mother (and Mack Napier's ex-wife), Malone C. Palmer.  (*Id.* at 8.)  At the Palmer residence, authorities found three individuals: Napier, Palmer, and Mack Napier.  During the search of Mack Napier's bedroom, authorities seized 124 80-mg oxycodone tablets from a dresser drawer, 100 80-mg oxycodone tablets from a shoe in the closet, and 43 40-mg oxycodone tablets and a Colt Double Eagle MK II pistol from a black suitcase.  (*Id.*)  Also found in Mack Napier's bedroom were five additional firearms, including a Smith & Wesson .38 caliber Airweight revolver found in

No. 09-5506
*USA v. Napier*

the bed where Mack Napier was sleeping. (*Id.*)  Another pistol and shotgun were seized in the master bedroom. (*Id.*)

In the bedroom where Lloyd Napier was sleeping, authorities found a bag of what was suspected to be marijuana, two marijuana "roaches," a set of digital scales, and miscellaneous documents. (*Id.*)  In various locations throughout the residence, authorities found and seized $65,052 in cash.  Following this search, Mack Napier was arrested on charges of being a fugitive from justice. (*Id.*)

After the search, Napier agreed to cooperate with authorities, and provided various statements incriminating himself, Mack Napier, and others. (*Id.* at 9.)  Additional seizure warrants were executed at different banks, and a total of $209,957.37 was seized from safety deposit boxes belonging to Mack Napier. (*Id.*)  With respect to Lloyd Napier's activity, the report detailed that from November 2007 to February 2008, Napier received and sold approximately 200 80-mg oxycodone tablets. (*Id.* at 10.) Most of the proceeds of these sales, in weekly amounts ranging from $50,000 to $100,000, went to Mack Napier. (*Id.*)  Ultimately, the presentence report recommended that Lloyd Napier be responsible for 15,000 80-mg oxycodone tablets, based on historical information and the quantity agreed to by the parties in the plea agreement. (*Id.* at 10.)

Napier filed three objections to the report, two of which were resolved in his favor.  None of his objections were to the factual history surrounding the offense conduct.  In his third objection, rejected by the district court,  Napier argued that he should not be given the dangerous weapon

- 4 -

No. 09-5506
*USA v. Napier*

enhancement to his offense level because, according to Napier, nothing in the presentence report

indicated that he had any knowledge of the presence of Mack Napier's weapons. (Objections at 1-2.)

Specifically, Napier stated:

> Lloyd Napier lived in Harlan County, Kentucky, and Mack Napier lived in Kodiak, Tennessee. Certainly Lloyd Napier was at the Tennessee house on occasion and certainly some, [i]f not most or all, of those visits related to the offense. However, Lloyd Napier would testify that on those occasions he was not in his father's bedroom and in fact as far as he knows his father kept the door to that room locked.

(*Id.* at 2.) In response to Napier's objections, an addendum to the presentence report was generated,

which includes the observation that Mack Napier "possessed a concealed weapon permit for years,

a fact which the Defendant have [sic] very likely been aware of." (Presentence Report at 21.) The

district court overruled the firearms objection, stating:

> [L]et's concede for purposes of the analysis that there was no actual knowledge here, but I don't have to find that there was actual knowledge here. I have to find that the presence of a firearm was reasonably foreseeable. Would a reasonable person foresee that a person in the position that Mr. Napier had, the kind of activity that he was involved in, of the relationship that Mr. Lloyd Napier is to Mr. Mack Napier as in father and son, is it reasonable that that person should have foreseen that his dad was possessing a firearm during these transactions? And I think the record is clear that it's reasonable to believe that he should have -- that would have been foreseeable that his father would have been carrying firearms.

(April 16, 2009 Transcript, Dist. Ct. Docket No. 98, at 34.) Accordingly, two points were added to

Napier's offense level for purposes of sentencing, resulting in a guideline range of 168 to 210

months of imprisonment. The district court imposed a 180-month sentence, and Napier now appeals.

No. 09-5506
*USA v. Napier*

## II.  STANDARD OF REVIEW

We review "a district court's legal conclusions regarding the Sentencing Guidelines de novo" and "a district court's factual findings in applying the Sentencing Guidelines for clear error." *United States v. Galvan*, 453 F.3d 738, 739 (6th Cir. 2006) (quoting *United States v. Galloway*, 439 F.3d 320, 322 (6th Cir. 2006)). "We apply de novo review to the district court's interpretation of the Guidelines." *Id.* (quoting *United States v. DeCarlo*, 434 F.3d 447, 452 (6th Cir. 2006)). "Whether a co-conspirator's actions were reasonably foreseeable is a factual finding reviewed for clear error." *United States v. Dupree*, 323 F.3d 480, 490 (6th Cir. 2003) (quoting *United States v. Tisdale*, 952 F.2d 934, 938 (6th Cir. 1992)).

## III.  ANALYSIS

The sole issue raised on appeal is whether the district court clearly erred in finding that Napier could have reasonably foreseen his father's possession of firearms.  Napier contends that the district court erroneously applied the enhancement for possession of a firearm under USSG § 2D1.1(b)(1), which provides that two points are to be added to the defendant's offense level "[i]f a dangerous weapon (including a firearm) was possessed."  It is the government's burden to prove this fact by a preponderance of the evidence.  *United States v. Walker*, 160 F.3d 1078, 1090 (6th Cir.1998); *see also United States v. Mickens*, 453 F.3d 668, 673 (6th Cir. 2006) ("By now, it is well established that the preponderance standard does not violate *Booker*, so long as the trial court appreciates that the guidelines are advisory, not binding.").  The government concedes that there is

No. 09-5506
*USA v. Napier*

no evidence that Napier ever possessed a firearm himself or that he knew firearms were present in his father's bedroom at the time of their seizure.  Thus, the possession of a firearm by Napier's father, a coconspirator, must be (1) connected to the conspiracy and (2) reasonably foreseeable. *United States v. Woods,* 604 F.3d 286, 290 (6th Cir. 2010) (citing USSG § 1B1.3(b)(1)(B); *United States v. Cochran*, 14 F.3d 1128, 1132 (6th Cir. 1994)).

Here, there is no dispute that firearms were actually possessed by Mack Napier in connection with the drug conspiracy, and Napier explicitly agrees that the district court correctly made the connection between the drug offense and the firearms.  (Def.'s Opening Br. at 4.)  Further, Napier did not file any objections to the factual history of the offense, as detailed in the presentence report.  Neither does Napier on appeal challenge any of the presentence report's factual statements, or the district court's adoption of those findings.  Instead, Napier argues that the district court clearly erred in concluding, based on those findings, that Napier could have reasonably foreseen Mack Napier's possession of a firearm.

By not objecting to the factual history in the presentence report, Napier "accepted all of the factual allegations contained in it." *United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008) (citing *United States v. Adkins*, 429 F.3d 631, 632-33 (6th Cir. 2005)); *see also United States v. Stafford*, 258 F.3d 465, 476 (6th Cir. 2001) ("We adhere to this rule in this case, holding that Defendant's failure to raise any sort of challenge in the proceedings below operates as an admission as to the drug types and quantities set forth in the [presentence report], and thereby provides the

No. 09-5506
*USA v. Napier*

requisite factual basis to sustain Defendant's enhanced sentence for a drug offense involving crack cocaine.").

Based on those factual findings, the district court did not clearly err by finding that Napier could have reasonably foreseen Mack Napier's possession of a firearm.   During the investigation of the offense, a source of information stated that Mack Napier kept a .38 caliber handgun on his person at all times.  This is consistent with the fact that during the March 4, 2008, search, a .38 caliber revolver was found in the bed with Mack Napier.  It is also consistent with the statement by their codefendant, Stepp, that he frequently saw Mack Napier armed.  (Presentence Report at 20.) A logical inference from these facts is that Napier, who was not only a coconspirator but also Mack Napier's son, would have known about Mack Napier's tendency to carry a gun.  This inference is reinforced by the fact that Napier indicated that when he was growing up, Mack Napier would sometimes shoot windows out of the family home when he was drunk.  (*Id.* at 14.)

Further, Napier admitted that he was at the Palmer residence on many occasions and that most of those occasions related to the offense.  During the search of the residence, in addition to the eight firearms seized from Mack Napier's bedroom, authorities seized over 224 80-mg oxycodone tablets, 43 40-mg oxycodone tablets, as well as $65,052 in cash.  Napier's frequent presence at the Palmer residence, which was itself used in connection with the offense, provides an additional basis for the district court's factual finding, particularly where the evidence supported a finding of a larger scale drug operation.

No. 09-5506
*USA v. Napier*

"We have explicitly rejected 'the fiction that a firearm's presence always will be foreseeable to persons participating in illegal drug transactions.'" *United States v. Catalan*, 499 F.3d 604, 607 (6th Cir. 2007) (citing *United States v. Cochran*, 14 F.3d 1128, 1133 (6th Cir. 1994)).   Instead, we require "objective evidence that the defendant . . . at least knew it was reasonably probable that his coconspirator would be armed." *Cochran*, 14 F.3d at 1133.   Typically, "we have declined to find clear error in a district court's conclusion that possession of a firearm was reasonably foreseeable when there are massive amounts of drugs in a single location." *United States v. Woods*, 604 F.3d 286, 291 (6th Cir. 2010).   In *Woods*, we reviewed the cases allowing the firearm enhancement based on a coconspirator's possession, and found that "[e]ach of these cases involved narcotics worth at least $60,000 located near the firearm. In contrast, we have been unable to affirm a finding of foreseeability when the amount of narcotics is lower." *Id.*

Here, Napier was found at the Palmer residence with over $60,000 in cash, along with 267 tablets of oxycodone.   Napier's presence in that house with his father and coconspirator, Mack Napier, and with his mother was not fleeting, but was a relatively common occurrence.   In light of this evidence, further bolstered by Mack Napier's history of gun use—as acknowledged by coconspirator Stepp, the source of information, and to a limited degree Napier himself—the district court did not clearly err in finding that Napier could have reasonably foreseen his father's possession of firearms.   We thus affirm the application of the enhancement for possession of a firearm under USSG § 2D1.1(b)(1).

No. 09-5506
*USA v. Napier*

## IV.  CONCLUSION

The sentence imposed by the district court is **AFFIRMED**.