NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0883n.06

Case No. 13-2596

**FILED**
Nov 24, 2014
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| DUANE MONTGOMERY, | ) | MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| _____/ | ) | |

**Before: MERRITT, GIBBONS, and DONALD, Circuit Judges.**

**MERRITT, Circuit Judge.** Defendant Duane Montgomery challenges the district court's imposition of an above-Guidelines sentence after a jury convicted him of fraudulently obtaining funds set aside for victims of the Deepwater Horizon oil spill. Specifically, this case asks us to decide whether the district court's initial Sentencing Guidelines calculation of 108-135 months was procedurally reasonable based on enhancements of intended loss, sophisticated means, and obstruction of justice. We are also asked to consider whether the district court's upward variance to a 180-month sentence was substantively reasonable. For the reasons that follow, we AFFIRM.

## I. Factual Background

In May 2010, the BP Deepwater Horizon oil rig exploded and released millions of barrels of crude oil into the Gulf of Mexico. In response to one of the worst ecological disasters in American history, BP and Congress set aside billions of dollars to help the victims. Beginning in June 2010 and continuing through his trial and sentencing, Defendant Duane Montgomery — a Michigan resident — fraudulently sought to obtain millions of dollars from these victim funds. All told, Montgomery filed five false claims for property damage and lost revenues with three different entities. As the common basis for each claim, Montgomery falsely reported that he had been performing a "pollution monitoring" job for his company in the Gulf of Mexico when tar balls from the oil spill destroyed his boat's engines, casting him adrift at sea for 15 days.

The evidence presented at trial proved Montgomery's claims to be completely untrue. He did not own a boat at the time, and certainly was not working in the Gulf during the oil spill. Indeed, the evidence proved Montgomery was actually in Michigan on numerous occasions during the period. As a result, a jury convicted him of three counts of mail fraud in violation of 18 U.S.C. § 1341.

### *Count One — BP Claim for $43,856.79:*

In June 2010, Montgomery submitted a property damage claim to BP for $43.856.78 for alleged damage to his company boat's engines. He supported this assertion with a boat registration obtained the day before he submitted the claim, an "invoice/repair order," bogus financial statements, and corporate income tax returns purportedly filed by his company showing gross receipts of $8.7 million in 2008 and $12 million in 2009. In fact, these purported IRS documents were complete fabrications: the company never filed any tax returns, the EIN

number was false, and Montgomery — the purported owner and CEO — filed no income tax returns and collected unemployment compensation during these years.

Montgomery also submitted a copy of an $8,109.00 GEICO insurance check as purported reimbursement for towing fees he received after his boat was disabled. In reality, GEICO had made this payment for a motorcycle Montgomery reported stolen in Michigan during the time he claimed to have been marooned in the Gulf of Mexico. In efforts to explain evidence that he was in a Michigan court for custody proceedings on dates he claimed to be working in the Gulf, Montgomery stated that he often drove his motorcycle overnight from New Orleans, sometimes "twice a week," to attend court proceedings in Detroit. The GEICO claim forms he filed when his motorcycle was stolen, however, showed an odometer reading of only 800 miles — fewer than a single one-way trip.

Montgomery's mailing of this property damage claim to BP for $43,856.78 formed the basis for count one of the conviction.

### *Count Two — GCCF Check for $43,900.00 and Related Claims:*

In August 2010, Montgomery filed an online claim with the Gulf Coast Claims Facility ("GCCF"), an agency created and funded by BP to respond to the economic crisis caused by the spill. This filing renewed his $43,856.78 property damage claim and sought an additional $37,475.88 in "lost company profits." Two months later, the GCCF sent an emergency advance payment of $43,900 to Montgomery's Livonia, Michigan commercial mailbox service, which was promptly retrieved and deposited by a friend at Montgomery's request. The mailing of this check provided the basis for Montgomery's second count of conviction.

Less than a month later, Montgomery submitted a second claim to the GCCF based on the same incident but seeking increased amounts of $65,343.22 for property damage and

$216,539.00 in lost profits. While this second claim was pending, in February 2011, Montgomery submitted yet another claim to the United States Coast Guard-administered National Pollution Funds Center ("NPFC"),[1] seeking $115,460.00 for property damage and $746,082.00 in lost earnings — a total of $861,512.00. Montgomery supplemented his original GCCF submission with an overview of the damage claim, a photocopy of an Ohio driver's license bearing a false social security number, receipts for engines he had ordered, work orders, photographs of engines being removed from the boat he claimed had been damaged by the oil spill, and seven pages of "task site logs" purporting to prove, by latitude and longitude tracking, that he had been in the Gulf of Mexico from March through May of 2010. In reality, Montgomery had recently negotiated for the purchase of a 65-foot power sailboat in Delaware, ordered twin diesel engines to refurbish it, and submitted pictures taken during that process to support his fraudulent claim. The task site logs, although authentic in appearance, were complete fabrications. After the Coast Guard denied the claim, Montgomery filed a $1 million personal injury claim with the GCCF asserting that, while marooned in the Gulf of Mexico, oil dispersant used in the cleanup caused injury to his eye.[2]

### Count Three — NPFC Request for Reconsideration of Denial of Claims:

In June 2011, Montgomery submitted a 99-page "Request for Reconsideration" of the NPFC's denial of his initial $864,512.00 claim along with a demand for $2,584,536.00 (three times his claim) for what he alleged was the NPFC's wrongful denial of his earlier claim. This document resembled a complaint for a lawsuit and bore two titles: "Request for Reconsideration" and another that had been stricken but remained visible: "~~Complaint and Jury~~

---

[1] The Pollution Funds Center was created by Congress and funded by taxes on domestic oil production to make emergency payments to persons injured by pollution.

[2] Although not a part of the indictment, this civil suit arose as part of the same scheme — i.e., Montgomery's assertion that he was in the Gulf as described in his property damage/lost profits claims.

Demand." In it, Montgomery repeatedly accused the Coast Guard of lying in its claims determination, abusing its discretion, and withholding his claim for $861,512.00 in an "arbitrary and capricious" manner. In addition, the request stated: "The Plaintiff also seeks monetary damages in the amount of $2,584,536." This request was the basis for the third count of conviction.

After the NPFC denied the Request for Reconsideration, in September 2011, Montgomery filed a civil lawsuit against the United States Coast Guard and the director of the NPFC, again seeking $2,584,536.00 in monetary damages for an "intentional and willful" violation of the law in denying his claim for $861,512.00. This still-pending[3] civil suit is based on the same allegations proven false in this criminal case.

### *Montgomery's Trial and Sentencing:*

At trial, Montgomery waived his right to counsel and represented himself with the help of appointed standby counsel. A jury swiftly convicted him on all three counts of mail fraud in violation of 18 U.S.C. § 1341.

At the sentencing hearing, the district court found that Montgomery's Offense Level Category was 29, resulting in a Guidelines range between 108 and 135 months. The court calculated the 29 points as follows: a base offense level of 7 under U.S.S.G. § 2B1.1(a)(1); plus 18 levels under U.S.S.G. § 2B1.1(b)(1)(J) based on the assertion that the intended loss exceeded $2.5 million; 2 levels under U.S.S.G. § 2B1.1(b)(10)(C) on the basis that the offense involved sophisticated means; and 2 levels under U.S.S.G. § 3C1.1 for obstruction of justice.

Noting Montgomery's history and characteristics, the seriousness of his offense, and the need to provide just punishment, the district court sentenced Montgomery to 180 months

---

[3] *See D. Montgomery, et al. v. United States Department of Homeland Security United States Coast Guard and Director of National Pollution Funds Center — Craig Bennett*, No. 11-2298 (E.D. La.).

imprisonment — a 45 month upward variance from the Guidelines range. After announcing the sentence, the court specifically asked both parties whether there were any unexpressed objections to the sentence. Montgomery answered that there were none. This timely appeal followed.

## II.      **Procedural History**

This appeal comes to us with a voluminous record and lengthy procedural history. Even before the imposition of the sentence at issue, Montgomery began filing various *pro se* pleadings with this Court. We dismissed case numbers 12-2466, 13-2136, 13-2194, 13-2454, 14-1170, and 14-1187 for lack of jurisdiction, or as premature or cumulative. Case number 13-2550 remains open. All arise from the conviction now before us in this appeal. Many are partial or even complete copies of motions previously denied by the district court.

In this case, No. 13-2596, Montgomery filed a *pro se* brief with this Court prior to entry of judgment but after appointment of appellate counsel. After Montgomery's court-appointed counsel filed a brief on his behalf, Montgomery moved this Court to: (1) consider counsel's brief as supplemental to his *pro se* brief; (2) dismiss court-appointed counsel and strike counsel's brief; (3) file a substitute *pro se* brief; (4) represent himself on appeal; and (4) impose sanctions against court-appointed counsel. The Government also moved to strike Montgomery's *pro se* motions and brief. After Montgomery responded, this Court denied all four of Montgomery's *pro se* motions and referred the Government's motion to strike the *pro se* brief to this panel.

Additionally, Montgomery has objected to his presentence investigation report ("PSR") and moved this Court to set aside a stipulated protective order and arrest judgment pursuant to Federal Rule of Criminal Procedure 34. Because these objections and motions raise issues that are intertwined with the merits of the appeal, they were referred to this panel for consideration. We will address each of the pending motions in turn.

### III. Pending Motions

#### A. *Government's Motion to Strike* Pro Se *Pleadings and Briefs*

The Government has moved this Court to strike Montgomery's *pro se* pleadings and briefs on the grounds that they violate the prohibition against hybrid representation on appeal as well as the word limit of Rule 32(a) of the Federal Rules of Appellate Procedure. We agree.

Under the Federal Rules of Appellate Procedure, a defendant — whether represented by counsel or proceeding *pro se* — must file a single brief. Fed. R. App. P. 31(a) ("The appellant must serve and file *a brief . . . .*" (emphasis added)). Once the defendant has done so, issues unaddressed by the original brief may not later be raised. *See United States v. Williams*, 544 F.3d 683, 690 (6th Cir. 2008) (citations omitted).

Additionally, the Supreme Court has held that there is no constitutional right to self-representation on appeal. *Martinez v. Court of Appeal of Cal.*, 528 U.S. 152, 163 (2000). Accordingly, we have stated that there is no "constitutional entitlement to submit a *pro se* appellate brief on direct appeal in addition to the brief submitted by appointed counsel." *McMeans v. Brigano*, 228 F.3d 674, 684 (6th Cir. 2000); *see also United States v. Mosley*, 810 F.2d 93, 97-98 (6th Cir. 1987) (noting that a defendant has a constitutional right to be represented by counsel or to represent himself during his criminal proceedings, but not both).[4] Indeed, the prohibition against hybrid representation is intended to prevent the exact type of procedural confusion presented in this appeal.

---

[4] Numerous other circuits have held that a defendant does not have the right to have both an attorney-filed brief and a *pro se* brief considered on appeal. *See, e.g.*, *United States v. Pearl*, 324 F.3d 1210, 1216 (10th Cir. 2003) ("As [the defendant] is represented by counsel, we deny his motion to file an additional *pro se* supplemental brief which the court received but did not file."); *United States v. Oreye*, 263 F.3d 669, 673 (7th Cir. 2001) ("[W]e don't allow hybrid representation on appeal . . . because hybrid representation confuses and extends matters."); *United States v. Gwiazdzinski*, 141 F.3d 784, 787 (7th Cir. 1998) (striking *pro se* motion and brief filed by represented defendant); *United States v. Martin*, 59 F.3d 767, 768 n.2 (8th Cir. 1995) (noting Eighth Circuit policy refusing to consider *pro se* filings when a party is represented by counsel); *United States v. Guadalupe*, 979 F.2d 790, 795 (10th Cir. 1992) ("Defendant has brought before us a *pro se* motion for leave to file a supplemental brief. Because he is represented by thoroughly competent counsel, his motion is out of order and denied.").

Permitting the filing of the *pro se* brief in addition to counsel's brief would also permit Montgomery to exceed the page and word limitations mandated by Rule 32(a) of the Federal Rules of Appellate Procedure. Although Montgomery's counsel's brief complies with Rule 32(a)(7)(B), it asks us to consider "Montgomery's previous filings" which, with attachments, amount to hundreds of pages. To permit consideration of these filings would dramatically increase both the number of issues raised and the sheer volume of text to be considered.

Accordingly, we grant the Government's motion to strike Montgomery's *pro se* pleadings and briefs. We will thus consider only the brief filed by Montgomery's counsel, as we generally do not consider additional arguments raised by a *pro se* defendant when that defendant is represented by counsel. *See United States v. Williams*, 641 F.3d 758, 770 (6th Cir. 2011).

### B.      *Montgomery's Other Motions*

The rule against considering *pro se* arguments of a counseled party on appeal is not without exception. Indeed, we have occasionally exercised our discretion to address supplemental *pro se* pleadings in addition to those filed by counsel. *See, e.g.*, *Miller v. United States*, 561 F. App'x 485, 489 (6th Cir. 2014) (exercising discretion to consider defendant's *pro se* arguments despite the fact that he was represented by counsel on appeal where issue presented appeared to have merit). In this case, although we are convinced that Montgomery's additional motions are utterly lacking in merit, we choose to address them because they demonstrate his continuing attempts to commit frauds upon the court.

### 1.      Objection to Presentence Investigation Report

Montgomery has filed an "Objection to Presentence Investigation Report" in which he claims that he never received proper service. As grounds for this objection, Montgomery renews his assertion that the PSR was mailed to the wrong address and he only viewed it the night before

his sentencing hearing when his standby counsel provided him with a copy. As noted by the district court, however, Montgomery had actually refused service of the PSR over six weeks prior. We will not permit Montgomery's refusal of service to stand as appropriate grounds for objection. Accordingly, we overrule this objection.

### 2. Motion for Order Arresting Judgment

Montgomery also moves for an "Order Arresting Judgment" pursuant to Rule 34 of the Federal Rules of Criminal Procedure. We will only grant such a motion if substantive defects exist in the indictment such that an offense is not charged, or if the district court lacked jurisdiction over the case. Fed. R. Crim. P. 34(a)(1)-(2).

Montgomery's only argument in support of his motion is his repeated false assertion[5] that there was an improper submission of an amended indictment to the petit jury without re-indictment by a grand jury. No such event occurred. Prior to trial, the district court dismissed three of the six counts against Montgomery and simply renumbered the indictment before presenting it to the jury. There was no substantive change; no terms or elements of any of the counts were altered. There is no rule against such a clarification of an indictment for the jury. Accordingly, we deny this motion.

### 3. Motion to Set Aside Stipulated Protective Order

Finally, Montgomery moves to set aside a June 29, 2012 protective order regarding the evidence in this case. As grounds for this motion, Montgomery alleges that the protective order bars him "from using any of the discovery in this Appeal or any other court case for any reason."

A challenge to a protective order requires a defendant to demonstrate "substantial prejudice" to overcome the order. *United States v. Davis*, 809 F.2d 1194, 1210 (6th Cir. 1987).

---

[5] Montgomery has already raised this argument numerous times in different forms. The district court previously rejected identical arguments made under Rules 7 and 33 of the Federal Rules of Criminal Procedure.

Montgomery has demonstrated no such prejudice. The standard order at issue simply limited Montgomery's ability to disseminate certain sensitive personal information. Montgomery received a full discovery package; the only redactions involved removal of social security numbers and other privacy information not relevant to the case-in-chief or the defense. We therefore deny this motion.

## IV.     Standard of Review

Montgomery challenges his sentence as both procedurally and substantively unreasonable. We review all challenges to the substantive reasonableness of a sentence under a deferential abuse of discretion standard, regardless of whether the imposed sentence is inside or outside the Guidelines range. *Gall v. United States*, 552 U.S. 38, 41 (2007). We also review preserved challenges to the procedural reasonableness of a sentence the same way — for an abuse of discretion. *Id.* We review unpreserved procedural reasonableness challenges, however, for plain error only. *United States v. Houston*, 529 F.3d 743, 753-54 (6th Cir. 2013). Under plain error review, relief is granted only under exceptional circumstances. *Id.* at 750.

## V.     Procedural Reasonableness Review

When reviewing the procedural reasonableness of a sentence, we "must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range." *Gall*, 552 U.S. at 51. We review a district court's factual findings at sentencing for clear error and its legal conclusions *de novo*. *United States v. Bolds*, 511 F.3d 568, 579 (6th Cir. 2007) (citation omitted). In this appeal, Montgomery contends that the district court inaccurately calculated the Guidelines range by making erroneous findings on three Guidelines enhancement factors: (1) amount of loss; (2) sophisticated means; and (3) obstruction of justice. We disagree.

### A. *Intended Loss Enhancement*

Montgomery argues that the district court erred by finding that he intended to obtain more than $2.5 million from his scheme to defraud and thus assessing 18 levels under U.S.S.G. § 2B1.1(b)(1)(J). We review a district court's loss calculation under the Sentencing Guidelines for clear error. *United States v. Mickens*, 453 F.3d 668, 670 (6th Cir. 2006) (citation omitted).

The Guidelines define loss as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 app. n.3(A). Intended loss has long been defined as "the loss the defendant subjectively intended to inflict on the victim, *e.g.*, the amount the defendant intended not to repay." *United States v. Moored*, 38 F.3d 1419, 1427 (6th Cir. 1994). Intended loss also includes "pecuniary harm that would have been impossible or unlikely to occur (*e.g.*, as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)." U.S.S.G. § 2B1.1 app. n.3(A)(ii).

Montgomery first contends that his sentence is procedurally unreasonable because the district court's intended-loss finding "merely adopted" the findings of the PSR. *See, e.g.*, *United States v. Ross*, 502 F.3d 521, 531 (6th Cir. 2007) (stating that when a defendant disputes PSR findings, the sentencing court may not summarily adopt the PSR's factual findings or simply declare the facts supported by a preponderance of the evidence). Montgomery's assertion, however, is not supported by the record, which demonstrates that the district court explicitly relied on the trial evidence in its intended loss finding:

> THE COURT: Okay. The defendant submitted a Request for Reconsideration of his denial of $861,000.05 — $861,512. That was proven outright at trial by the United States, along with a claim of demand for $2,584,536 that you allege was three times your earlier claim. . . . *The probation officer's report is based upon facts and evidence at trial that I recall*.

(Sentencing Hr'g Tr. at 10) (emphasis added). Thus, there is no error because the district court did not merely rely on the PSR — it instead expressly recalled trial evidence in finding that Montgomery had demanded $2,584,536.00.

Additionally, the district court was well aware that when Montgomery's last claim was denied, he subsequently filed a civil suit against the Coast Guard in which he again claimed $2,584,536.00 based on the Coast Guard's denial of his NPFC claim. This lawsuit alone provides sufficient basis for the loss finding, and certainly supports the district court's finding that Montgomery intended losses of that amount. *See* U.S.S.G. § 1B1.3(a)(2) (requiring "all acts and omissions" that are "part of the same course of conduct or common scheme or plan" to be included in Guidelines calculations).

### B. *"Sophisticated Means" Enhancement*

Montgomery also argues that the district court abused its discretion by enhancing his sentence under U.S.S.G. § 2B1.1(b)(10)(C), which provides for a two-level increase if "the offense otherwise involved sophisticated means." The thrust of Montgomery's argument is that there was essentially nothing sophisticated about his scheme. A series of criminal actions, however, may constitute sophisticated means even if none of the offenses, standing alone, is especially complex or intricate. *See United States v. Tandon*, 111 F.3d 482, 491 (6th Cir. 1997).

Montgomery erroneously asserts that his actions "were relatively crude and one dimensional" and do not support application of the § 2B1.1(b)(10)(C) enhancement. (Appellant's Br. at 28). His scheme to defraud included no less than six separate submissions to three entities from June 2010 through June 2011, the use of a commercial mailbox-drop service in the name of an apparent shell corporation, and the production and repeated submission of false quarterly profit and loss statements, purportedly from his company, showing millions of dollars

of revenue to support his claims of economic damages.  Montgomery also used and submitted an Ohio driver's license bearing a false address and false social security number and mailed his claims from multiple states.  We have routinely upheld the application of the sophisticated means enhancement for these types of activities.  *See, e.g.*, *United States v. Lewis*, 76 F. App'x 47, 48 (6th Cir. 2003) (upholding enhancement where defendant fraudulently obtained merchandise through use of an alias, fictitious companies, and fictitious references).  Accordingly, we cannot say that the district court abused its discretion in applying this enhancement.

### C.      Obstruction of Justice Enhancement

Montgomery's third argument asserts that the district court erred in finding that he "obstructed justice" within the meaning of U.S.S.G. § 3C1.1, which provides for a two-level increase where "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction."  One type of conduct to which this enhancement applies involves "providing materially false information to a judge." *Id.* at app. n.4(F).

On two separate occasions, Montgomery sought to suppress evidence at trial by asserting that all of his statements and claims were merely part of "settlement negotiations" and therefore barred under Federal Rule of Evidence 408.  As the basis for these motions, Montgomery offered email evidence that the Coast Guard had solicited him for settlement discussions — something which he knew to be false.  This "solicitation," however, was actually an undercover ruse designed to lure Montgomery to Detroit for arrest, a fact revealed to him over one year before trial.  Additionally, before Montgomery filed the second motion, the prosecutor warned him that his characterization of the undercover operation as an offer to settle would constitute a fraud upon the court.  Montgomery filed the motion containing the false statements anyway and later

repeated the assertion in his opening remarks, claiming at least twice that the Coast Guard offered him "145 grand" to settle the claims.

Montgomery mischaracterizes his conduct. The district court assessed a two-level enhancement not because Montgomery filed a "legally unsound motion," or "asserted that fake settlement negotiations should be inadmissible" (Appellant's Br. at 28, 30), but because he willfully provided false material information to the district court in his two motions to suppress evidence. When Montgomery raised his objection to this enhancement at sentencing, the district court was clear in its finding that the motions were totally false, based upon lies, and "one of the many things . . . filed with no basis, dishonesty, and a complete fraud on the court." Accordingly, we hold that the district court did not abuse its discretion by finding that Montgomery's willful submission and reliance upon false statements in his motions to suppress evidence was conduct covered by U.S.S.G. § 3C1.1.

## VI.    Substantive Reasonableness Review

To be substantively reasonable, the length of the sentence "must be proportionate to the seriousness of the circumstances of the offense and offender, and sufficient but not greater than necessary, to comply with the purposes of § 3553(a)." *United States v. Vowell*, 516 F.3d 503, 512 (6th Cir. 2008) (internal quotations omitted). Additionally, "[a] sentence is substantively unreasonable if the district court 'selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor.'" *United States v. Hall*, 632 F.3d 331, 335 (6th Cir. 2011) (quoting *United States v. Baker*, 559 F.3d 443, 448 (6th Cir. 2009)).

We look at "the sentence in light of the totality of the circumstances, giving 'due deference' to the sentencing judge, in recognition of his greater familiarity with the case, his

superior position to find facts and assess credibility, and the institutional advantage that comes with frequent sentencing of offenders." *United States v. Houston*, 529 F.3d 743, 755 (6th Cir. 2008) (citing *Gall*, 552 U.S. at 597-98). Thus, "'[t]he fact that [we] might have reasonably concluded that a different sentence was appropriate is insufficient to justify reversal of the district court.'" *Bolds*, 511 F.3d at 581 (quoting *Gall*, 552 U.S. at 47).

### A. *Factual Findings Supported by the Record*

Montgomery first argues that his sentence was unreasonable because the district court relied on history and characteristics that are unsupported by the record and do not meet the preponderance standard. Montgomery faults the district court for finding that he was dangerous, but in reaching this conclusion the court correctly relied on Montgomery's recent history of possession of high caliber weapons and ammunition, his illegal possession of silencers and body armor, and his prior convictions for assault and obstructing a police officer. Nor did the district court clearly err in characterizing Montgomery's criminal history as "lengthy" — he had accrued four convictions and a probation violation in a six-year period, two of which, despite Montgomery's assertions to the contrary, were for fraud. Finally, we find no error in the district court's finding that Montgomery's history and characteristics included his deplorable treatment of women. Although Montgomery is correct that there was no evidence of physical abuse of women, there was ample evidence of "lies, deceit and abuse," some of which amounted to psychological warfare. The court cited Montgomery's targeted abuse toward his ex-wife: after a two-week courtship and one-month marriage, he sued for custody of her children from a prior relationship as well as an unborn baby he knew was not biologically his and appealed the denial all the way to the Michigan Supreme Court "for no other reason than to abuse and terrorize" her.

Accordingly, this argument is without merit.

### B.    *Purposes of Sentencing Under § 3553(a)(2)*

Montgomery next suggests that the district court's upward variance was unnecessary to serve the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2). We disagree, and hold that the district court properly and adequately considered the statutory purposes of sentencing. A review of the transcript from the sentencing hearing reveals the district court's belief that upward variance was necessary to serve the purposes of § 3553(a)(2)(A) — to reflect the seriousness of the offense, promote respect for the law, and provide just punishment. The court stated that an above-Guidelines sentence was necessary to "affect a change in [Montgomery's] lifestyle" and to provide just punishment for what it found to be a very serious offense — *i.e.*, "attempting to steal over $2.5 million from victims of the worst oil disaster of all time on the most outrageously false basis imaginable." The court also found that Montgomery was "lacking in respect for the law" and thus "most deserving of a high sentence to justly punish him." It also observed that it had never seen a case as "flagrant, outrageous, repulsive and, frankly, incredible" as this one. The court further found Montgomery to be a significant danger to the public, both in terms of his continuing abuse of process, as well as his assaultive history and undisputed past possession of numerous high-caliber weapons, ammunition, silencers, and body armor. We agree.

We also find no abuse of discretion in the district court's application of § 3553(a)(2)(B) and (C). At the sentencing hearing, the court noted that Montgomery seemed unable to ever admit the truth (even in the face of irrefutable evidence to the contrary) and had a lengthy history of filing frivolous lawsuits[6] and using the judicial system as a weapon — against his ex-wife and

---

[6] The present case is not the only example of Montgomery's false and unsubstantiated claims. Indeed, he has a history of making them. In the Eastern District of Michigan alone, a cursory review of PACER reveals that Montgomery has had no less than five civil suits dismissed on summary disposition motions. In one particularly relevant example, Montgomery's claim that his eviction by a bank after a foreclosure resulted in the unlawful conversion of over $6 million in personal property was belied by his claim in bankruptcy, only a few months before, that his total assets amounted to only $600. (10-cv-11729, Doc. # 117, at 4-5).

others.  It thus concluded that an upward variance would serve the purposes of deterrence and protection of the public.

Finally, the district court found that an upward variance would provide an opportunity for Montgomery's rehabilitation pursuant to § 3553(a)(2)(D).  In fact, the sentencing judge specifically referred to other correctional treatment when it spoke of the need to affect a change in Montgomery's persistent fraudulent conduct, and revisited the issue while addressing Montgomery directly after imposing the sentence.

### C.      Sentencing Uniformity Under § 3553(a)(6)

Montgomery's final argument alleges that the district court failed to consider national uniformity under § 3553(a)(6) in imposing its sentence.  This argument lacks merit because the sentencing judge carefully balanced the other § 3553(a) factors in arriving at the upward variance. *See United States v. Kirchof*, 505 F.3d 409, 413 (6th Cir. 2007).  The discussion of the record above demonstrates that the district court explicitly addressed nearly all of the § 3553(a) factors and provided a detailed explanation of its reasoning.

The unique nature of this case further defeats Montgomery's disparity argument. The goal of 18 U.S.C. § 3553(a)(6) is to eliminate "disparities among defendants with similar records who have been found guilty of similar conduct."  Montgomery cites to no similar defendants, likely because there are none.  He is not a typical white-collar criminal.  Indeed, he appears to be completely untethered from the truth.  Perhaps even more troubling is his lack of remorse about his prevarications.  He continues to maintain that he was stranded in the Gulf of Mexico when the Government proved beyond any rational doubt whatsoever that he was not there.

### VII.    Conclusion

Accordingly, the judgment of the district court is AFFIRMED.