NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0584n.06

Case Nos. 24-5622/5627

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

Dec 17, 2025

KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| KELLY HARRIS; NEAL HARRIS, | ) | KENTUCKY |
| Defendants-Appellants. | ) | |
| | ) | OPINION |
| | ) | |

Before: GRIFFIN, THAPAR, and MATHIS, Circuit Judges.

**MATHIS, Circuit Judge.** Kelly and Neal Harris submitted fraudulent applications to the federal government's COVID-19 relief program. They received over $300,000 in business loans as a result. A jury convicted Kelly and Neal[1] of multiple counts of wire fraud. On appeal, the Harrises challenge their convictions and the reasonableness of their sentences. Kelly also claims she received ineffective assistance of counsel at trial. We affirm.

**I.**

In March 2020, Congress appropriated funds for the COVID-19 Economic Injury Disaster Loan ("EIDL") program to address economic hardship to businesses across the United States. Administered by the Small Business Association ("SBA"), the EIDL program provided loans and grants to help small businesses meet operating costs during the pandemic.

---

[1] Because the defendants share a last name, we refer to them by their first names.

Business owners submitted EIDL applications online to the SBA. Applicants provided basic information about their business, including gross revenues, which the SBA used to calculate the business's working capital needs for six months. Businesses were also eligible to receive grants of $1,000 per employee, up to $10,000 per business. Given the urgency and magnitude of the pandemic, the SBA did not independently verify the information provided by applicants.

Between May 5, 2020, and July 25, 2020, Kelly and Neal Harris, who are married, submitted numerous EIDL applications for businesses they purportedly operated. These businesses, however, were largely a sham, each with little-to-no revenue, employees, or physical presence.

Kelly submitted applications for three entities: Ruby E. Bailey Family Service Center, Inc. ("Ruby Bailey"), Turtle Doves LLC, and North Side Market. Neal submitted applications for two entities: Grace Christian Fellowship Church ("Grace Christian") and American Workhorse LLC. Their strategy was to submit multiple applications for the same entity, tweaking the number of employees and other metrics until they were approved. For example, the initial applications for Ruby Bailey and Grace Christian were declined until the Harrises changed the industry sector from "faith-based" to "agricultural." This is notable because, at the time, the SBA approved EIDL funds only for agricultural enterprises.

The SBA approved relief for three entities and deposited the funds into the Harrises' joint accounts at Central Bank: $102,200 for Turtle Doves, $152,900 for Ruby Bailey, and $99,200 for Grace Christian.[2] According to the information provided on the approved applications, Ruby Bailey had annual revenues of $378,000 and three employees, Turtle Doves had annual revenues

---

[2] These totals reflect the combined amounts each entity received in loans and advances. Although American Workhorse did not receive an EIDL loan, it did receive a $3,000 advance.

of $247,926 and five employees, and Grace Christian had annual revenues of $198,459 and three employees. Again, the Harrises described each business as "agricultural," despite referring to Ruby Bailey and Grace Christian on prior, declined applications as "faith-based organizations."

In the summer of 2020, Central Bank noticed that the Harrises were making large cash withdrawals of their EIDL funds. After reporting these transactions to federal authorities, the bank returned the unspent EIDL funds—$186,503.37—to the SBA. The Harrises had withdrawn nearly half of the $357,300 they received from the SBA.

A grand jury returned a twelve-count indictment against Kelly and Neal alleging wire fraud under 18 U.S.C. § 1343, for obtaining or attempting to obtain "EIDL proceeds under false and misleading pretenses." R. 1, PageID 3. Specifically, Kelly was charged with four counts of wire fraud for filing false applications for Ruby Bailey, Turtle Doves, and North Side Market and four counts of wire fraud for receiving funds for Ruby Bailey and Turtle Doves. Neal was charged with two counts of wire fraud for filing false applications for Grace Christian and American Workhorse and six counts of wire fraud for receiving funds for Ruby Bailey, Turtle Doves, and Grace Christian.

The Harrises exercised their right to a jury trial. At trial, the government presented evidence showing that much of the information Kelly and Neal provided on their EIDL applications was false. According to federal agents, tax records and state unemployment records showed no evidence of employees at any of the funded entities. And despite the Harrises' claims of six-figure annual revenues for each entity, Kelly declared no personal or business income in 2019, while Neal declared only $31,628 in gross business income, all from a barbeque business.

Moreover, investigators found no evidence that the three businesses functioned at the addresses that the Harrises provided. One agent testified that the address Kelly listed for North

Side Market belonged to a Pizza Hut that had shut down. The government also offered evidence of the Harrises' efforts to make the funded entities appear more legitimate after the fact. For example, after Central Bank returned the funds to the SBA, Kelly completed a 2019 tax return for Ruby Bailey claiming the same revenue figures she provided to the SBA.

How did Kelly and Neal respond to this evidence? Kelly testified that much of the information she provided on the applications was correct and that any false information was the result of good-faith mistakes on her part. She also stated that her understanding of "employees" included children earning cash. Like Kelly, Neal testified that any false or inconsistent information on his applications was the result of mistake, not fraud. The jury convicted the Harrises on all counts.

The case proceeded to sentencing. The district court applied sentencing enhancements to Kelly and Neal for: (1) obstruction of justice, under U.S.S.G. § 3C1.1; and (2) using sophisticated means, under U.S.S.G. § 2B1.1. After applying those enhancements, Kelly's advisory Sentencing Guidelines range was 46 to 57 months' imprisonment. Neal's advisory Guidelines range was 37 to 46 months' imprisonment. The district court sentenced Kelly to 46 months' imprisonment and Neal to 37 months' imprisonment. The Harrises timely appealed.

**II.**

On appeal, Kelly and Neal both argue that the government presented insufficient evidence to sustain their wire-fraud convictions and that their sentences are substantively unreasonable. Kelly separately argues that her sentence is procedurally unreasonable because the district court improperly applied obstruction-of-justice and sophisticated-means sentencing enhancements. She also claims that she received ineffective assistance of counsel at trial. We address each challenge in turn.

**A. Sufficiency of the Evidence**

We begin with the Harrises' challenges to their wire-fraud convictions. "We review de novo the sufficiency of the evidence to sustain a conviction." *United States v. Emmons*, 8 F.4th 454, 477 (6th Cir. 2021) (citation modified). We ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (quotation omitted). In answering this question, we leave it to the jury "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* (quotation omitted). So we "resolve all issues of credibility in favor of the jury's verdict," *United States v. Johnson*, 79 F.4th 684, 711 (6th Cir. 2023) (quotation omitted), and "reverse a judgment for insufficient evidence only if the judgment is not supported by substantial and competent evidence upon the record as a whole," *United States v. Vichitvongsa*, 819 F.3d 260, 270 (6th Cir. 2016) (quotation omitted). Such evidence must merely be "more than a scintilla." *United States v. Grubbs*, 506 F.3d 434, 439 (6th Cir. 2007) (quotation omitted).

"Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. LaVictor*, 848 F.3d 428, 456 (6th Cir. 2017) (quotation omitted). Therefore, "a defendant claiming insufficiency of the evidence bears a very heavy burden." *Emmons*, 8 F.4th at 478 (quotation omitted).

The wire-fraud statute makes it a crime for:

> [w]hoever, having devised . . . any scheme or artifice to defraud, or
> for obtaining money or property by means of false or fraudulent
> pretenses, representations, or promises, transmits or causes to be
> transmitted by means of wire . . . in interstate or foreign commerce,
> any writings . . . for the purpose of executing such scheme or
> artifice[.]

18 U.S.C. § 1343. The government must prove three elements to sustain a wire-fraud conviction: "(1) a scheme or artifice to defraud; (2) use of interstate wire communications in furtherance of the scheme; and (3) intent to deprive a victim of money or property." *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003) (quotation omitted). The Harrises do not contest the use of interstate wire communications.

They argue that the government failed to establish a scheme to defraud and intent to deprive. A scheme to defraud includes "any plan or course of action by which someone intends to . . . deprive another by deception of money or property by means of false or fraudulent pretenses, representations, or promises." *Id.* at 485 (quotation omitted). To satisfy this element, "the government must prove that the defendant said something materially false," *id.* at 486 (emphasis omitted), that could have influenced a "person of ordinary prudence and comprehension," *United States v. Robinson*, 99 F.4th 344, 355 (6th Cir. 2024) (citation modified). For the intent-to-deprive element, the government must prove specific intent—that "the misrepresentation or omission must have the purpose of inducing the victim of the fraud to part with property or undertake some action that he would not otherwise do absent the misrepresentation or omission." *Daniel*, 329 F.3d at 487 (quotation omitted).

There is sufficient evidence to sustain the wire-fraud convictions for Kelly and Neal. So, for the reasons below, both defendants' sufficiency-of-the-evidence challenges fail.

**1.**

Starting with Kelly, there is substantial evidence that she engaged in a scheme to defraud the SBA by making materially false representations on her EIDL applications. The government introduced evidence that Kelly, when she submitted her applications, misrepresented the dates of establishment, gross receipts, lost rents, and number of employees for Turtle Doves and North Side

Market. She also falsely represented the gross receipts, lost rents, and number of employees for Ruby Bailey. Because of her misrepresentations, Kelly received funds from the SBA into accounts she established at Central Bank for her purported businesses. Kelly's representations were material, given that revenue figures and employee counts were key metrics the SBA used to determine how much money applicants should receive. Faced with gaps and inconsistencies about the revenue history and number of employees for Turtle Doves, North Side Market, and Ruby Bailey, the jury reasonably determined that Kelly made false representations.

Indeed, the false representations influenced the SBA to part with federal funds. Although the SBA relaxed some of its review standards considering the difficult economic conditions during the COVID-19 pandemic, Kelly asserts incorrectly that the agency simply rubberstamped her applications, regardless of their falsity. On the contrary, it was only after Kelly began falsely claiming her businesses were "agricultural" that the SBA began approving her applications.

The jury could infer Kelly's intent to deceive from the circumstantial evidence presented at trial. *See United States v. Davis*, 490 F.3d 541, 549–50 (6th Cir. 2007). For example, the bank accounts for Ruby Bailey and Turtle Doves had no deposits other than EIDL payouts. The Harrises made cash withdrawals from the accounts and used EIDL proceeds for personal use, not business expenses. Investigators visited the listed addresses for each business and found no evidence tying the locations to any business activity by Kelly. For the most part, Kelly established email addresses, business accounts, and tax forms for each entity contemporaneously with, or well after, submitting the EIDL applications for the entity. And Kelly filed a tax return for tax year 2019 for Ruby Bailey—and completed, but never filed, a 2019 return for Turtle Doves—only after Central Bank returned the funds at the SBA's request.

Kelly maintains that she sought the EIDL loans in good faith with no intent to deceive. She argues that *if* she made falsehoods, they were simply good-faith mistakes, and that she answered the application questions to the best of her knowledge. Kelly applied on her phone, which she says made the applications difficult to read and review. She also claims that many of the questions confused her; for example, she believed that "lost rents" referred to rent she owed, not rent owed to her. R. 173, PageID 1660. And Kelly says she submitted duplicate applications because of system errors that led her to believe the applications had not been fully submitted.

Yet the jury rejected her evidence and arguments. And for the purposes of our review, the evidence "need not exclude every reasonable explanation except that of guilt" for us to conclude that a rational trier of fact could find Kelly guilty beyond a reasonable doubt. *United States v. Gonzalez*, 512 F.3d 285, 294 (6th Cir. 2008). The government offered "substantial" evidence that qualifies as "more than a scintilla." *Grubbs*, 506 F.3d at 439. Moreover, the government sourced this evidence from authenticated documents and from bank employees and federal agents, who are trained to identify fraud. Thus, the evidence was also "competent." *Id.* at 438.

**2.**

There is also sufficient evidence to support Neal's convictions. The record amply supports the jury's finding that Neal made false representations. For example, on his applications for Grace Christian and American Workforce, he claimed combined annual revenues of $487,017. Yet he claimed only $33,628 in total business revenue on his 2019 tax return, all from a separate, unrelated enterprise.

The evidence also indicates that Neal acted with intent to deceive. He established a bank account for Grace Christian only *after* the SBA approved his application, and he withdrew funds from it for expenses that were non-business related, including fees for his personal bankruptcy

attorney. He also attempted to obtain cashier's checks drawn on the Grace Christian business account remitted in his own name, not the church's. True, only Kelly's name appeared on the Ruby Bailey and Turtle Doves applications. But Neal jointly owned the bank accounts that received funds for those two entities. He also withdrew money from these accounts, including by signing multiple checks payable to cash.

Neal points the finger at Kelly for any fraudulent conduct, including the EIDL applications in his name. And although Neal withdrew EIDL funds from accounts belonging to all three approved entities, he claims that he often did so at his wife's direction and with no knowledge of how the funds were obtained or used.

We cannot say these alternate theories are impossible. But again, our review is limited to determining whether the evidence supporting the wire-fraud convictions was "substantial," "competent," and "more than a scintilla." *Grubbs*, 506 F.3d at 438–39. It was. Thus, Neal's sufficiency-of-the-evidence challenge also fails.

**B. Ineffective Assistance of Counsel**

Kelly also seeks to have her convictions set aside because her trial counsel allegedly provided ineffective assistance of counsel at trial. She raises her ineffective-assistance-of-counsel challenge on direct appeal.

"We typically decline to address claims of ineffective assistance on direct appeal and instead require defendants to file a postconviction motion to vacate their sentence pursuant to 28 U.S.C. § 2255." *United States v. Zheng*, 27 F.4th 1239, 1243 (6th Cir. 2022) (quotation omitted). We reason that § 2255 proceedings are the better forum because "the record regarding counsel's performance can be developed in more detail." *United States v. Lopez-Medina*, 461 F.3d 724, 737 (6th Cir. 2006). So unless "the existing record is adequate to assess properly the merits of the

claim," we will decline to address it on direct review. *United States v. Hynes*, 467 F.3d 951, 969 (6th Cir. 2006) (quotation omitted).

The record is not developed sufficiently to assess Kelly's ineffective-assistance-of-counsel challenge on direct appeal. Although the record reflects the various actions and inactions by Kelly's trial counsel—his repeated use of the word "fraudster," his failures to object or introduce evidence, and his occasional inability to hear due to technical issues—we do not know why counsel took, or did not take, certain actions. The record merely reflects "the action taken by counsel but not the reasons for it." *See Massaro v. United States*, 538 U.S. 500, 505 (2003). And we do not know the extent or impact of counsel's hearing issue. We therefore decline to address Kelly's ineffective-assistance claim.

### C. Procedural Reasonableness

We move next to Kelly's challenge to the procedural reasonableness of her sentence. A district court imposes a procedurally unreasonable sentence by "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Gall v. United States*, 552 U.S. 38, 51 (2007). Kelly argues that the district court improperly calculated her Guidelines range when it applied: (1) a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1, and (2) a two-level enhancement for sophisticated means under § 2B1.1(b)(10)(C). We disagree.

### 1.

We begin with the obstruction-of-justice enhancement. The district court applied this enhancement because it found that Kelly committed perjury at trial. We review for clear error both the district court's factual findings and its application of the perjury-based obstruction-of-

justice enhancement to Kelly's conduct. *United States v. Jackson*, 154 F.4th 422, 427–28 (6th Cir. 2025). We review the district court's legal conclusions de novo. *Id.* at 427.

The Sentencing Guidelines require a two-level enhancement for a defendant who has "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1. The obstructive conduct must also relate to "(A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." *Id.* Such conduct includes "the commission of perjury." *United States v. Maliszewski*, 161 F.3d 992, 1030 (6th Cir. 1998); *see also* U.S.S.G. § 3C1.1 cmt. n.4(F).

We have explained the steps a district court should follow when applying a perjury-based obstruction enhancement. The district court should first "identify those particular portions of the defendant's testimony that it considers to be perjurious." *United States v. Castro*, 960 F.3d 857, 870 (6th Cir. 2020) (quotation omitted). Then it "must either make specific findings for each element of perjury or at least make a finding that encompasses all of the factual predicates for a finding of perjury." *Id.* (quotation omitted). These predicates "are that (1) the defendant gave false testimony (2) concerning a material matter and (3) with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Id.*

The district court found that Kelly perjured herself at least four times. Those four times included when Kelly testified that: (1) Ruby Bailey had $378,000 in revenue; (2) Turtle Doves was an operating entity at 800 Main Street; (3) she paid rent on the Turtle Doves property; and (4) Ruby Bailey had three employees. Regarding all four statements, the district court's factual findings were not against the weight of the evidence. And its three-part analysis of each statement's falsity, willfulness, and materiality was not clearly erroneous. Careful not to "penalize

the defendant for the decision to take the stand," R. 182, PageID 1975, the district court addressed Kelly's false statements one-by-one and made specific findings that each satisfied the elements of perjury.

Take Kelly's testimony about Ruby Bailey's income. At trial, the government asked Kelly, "It's your testimony that Ruby Bailey had $378,000 in revenue in 2019?" R. 173, PageID 1642. Kelly replied, "Yes, and we did file a tax return showing that." *Id.* The district court concluded that this figure was false because the jury found Kelly guilty on Count 5, which charged that she "falsely claim[ed] [Ruby Bailey] had gross receipts of $378,000." R. 1, PageID 5. The district court also correctly found that this statement was material because the SBA calculated her loan amount based on that same false revenue figure. Finally, the district court correctly considered this statement to be intentionally false because, again, in convicting Kelly on Count 5, the jury found an intent to defraud with respect to the Ruby Bailey application.

Kelly argues that, even if these statements were false, they were the result of "confusion, mistake, or faulty memory" and thus fail to satisfy the element of willfulness. D. 37 at p.52 (quotation omitted). For example, she insists that the false employee counts cannot support a perjury finding because she was confused about whether the SBA considered volunteers and children to be employees. But that does nothing to explain Kelly's unequivocal testimony about Ruby Bailey's revenue amount for 2019. Kelly offers no plausible argument that her testimony of Ruby Bailey's revenue—which was very specific and remained consistent across the EIDL application, the post-hoc tax return, and her testimony—resulted from confusion or mistake. And there need be only one instance of perjury to justify an obstruction enhancement. Kelly's testimony about Ruby Bailey's income was perjurious, so we need not analyze the other statements.

**2.**

We turn now to the sophisticated-means enhancement. We review the district court's legal conclusions de novo and its factual findings for clear error, but our caselaw remains unsettled whether to review the application of the enhancement to those factual findings for clear error or de novo. *United States v. Rupp*, No. 22-1240, 2023 WL 370908, at *5 (6th Cir. Jan. 24, 2023). We need not wade into the debate because Kelly's challenge fails under either standard.

The Sentencing Guidelines requires a two-point enhancement when "the offense . . . involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." U.S.S.G. § 2B1.1(b)(10)(C). The Guidelines commentary describes "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *Id.* § 2B1.1 cmt. n.9(B). Such conduct may include "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." *Id.* "We do not look to the individual steps of the scheme, but instead to the totality of the defendant's conduct." *United States v. Chappelle*, 78 F.4th 854, 862 (6th Cir. 2023) (citation modified).

The district court's application of the enhancement is consistent with our precedent and the plain language of the Guideline and its commentary. The evidence supports the district court's findings that Kelly created false tax documents, email addresses, and bank accounts for her supposed businesses, in a post-hoc effort to make them seem legitimate. She made large cash withdrawals and bank transfers, making it harder to detect her improper use of EIDL funds. And her conduct was repetitive across numerous entities and applications.

False documentation, cash withdrawals, and repetitive conduct are all hallmarks of cases where we have upheld sophisticated-means enhancements. In *United States v. Montgomery*, we

concluded that the district court properly applied the enhancement to a defendant who created false profit-and-loss statements to substantiate fraudulent property-damage claims. 592 F. App'x 411, 419 (6th Cir. 2014). In *United States v. Middleton*, we cited the defendant's use of cash and non-traceable instruments as a factor supporting a sophisticated-means finding. 246 F.3d 825, 848 (6th Cir. 2001). And in *United States v. Vysniauskas*, we said that "repeated use of false identities in an extensive and repetitive scheme supports [a sophisticated-means] enhancement, even if the information used was not itself unduly complex or difficult to obtain." 593 F. App'x 518, 531–32 (6th Cir. 2015) (citation modified).

Kelly maintains that she is "not a sophisticated business person" and that "the[] allegations [against her] do not describe a sophisticated scheme." D. 37 at p.57. She says she did not try to hide her identity; she even contacted law enforcement herself after the bank returned her funds. Kelly also emphasizes that she did not use offshore accounts, adding, "To the extent there was a scheme to defraud, th[e] scheme was pedestrian." *Id.* at p.56.

These arguments do not negate the application of the sophisticated-means enhancement. We must consider the totality of the scheme, not the sophistication—or lack thereof—of individual acts. *Cf. Chappelle*, 78 F.4th at 862. Moreover, acts that seem unsophisticated in isolation may still constitute "sophisticated means" when considered together. *United States v. Tandon*, 111 F.3d 482, 491 (6th Cir. 1997). Kelly's reference to offshore accounts means little, as there are many ways to use sophisticated means to execute or conceal a financial crime without using offshore accounts.

### D. Substantive Reasonableness

Finally, we turn to the Harrises' arguments that their sentences are substantively unreasonable. We review the substantive reasonableness of a sentence under the abuse-of-

discretion standard. *Gall*, 552 U.S. at 51. We ask "whether the length of the sentence is greater than necessary to achieve the sentencing goals set forth in 18 U.S.C. § 3553(a)." *United States v. Tristan-Madrigal*, 601 F.3d 629, 632–33 (6th Cir. 2010) (citation modified). Relevant factors include the nature and circumstances of the offense; the history and characteristics of the defendant; and the need to provide just punishment, afford adequate deterrence, protect the public from further crimes, and provide correctional treatment. 18 U.S.C. § 3553(a); *United States v. Simmons*, 501 F.3d 620, 625 (6th Cir. 2007). The focus is on whether "the court placed too much weight on some of the § 3553(a) factors and too little on others in sentencing the individual." *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018).

The defendant bears the burden of showing that a sentence is substantively unreasonable. *United States v. Woodard*, 638 F.3d 506, 510 (6th Cir. 2011). And this burden is particularly heavy when challenging a within-Guidelines sentence, which receives a presumption of reasonableness. *United States v. Vonner*, 516 F.3d 382, 389–90 (6th Cir. 2008) (en banc). "[A] defendant can rebut this presumption if a district court chose a sentence arbitrarily, ignored pertinent § 3553(a) factors, or gave unreasonable weight to any single factor." *United States v. Xu*, 114 F.4th 829, 846–47 (6th Cir. 2024) (quotation omitted).

### 1.

Kelly's substantive-reasonableness challenge fails. In sentencing Kelly to 46 months' imprisonment, the district court considered all pertinent § 3553(a) factors, including her minimal criminal history and acts of community service. It then weighed these mitigating individual characteristics against numerous aggravating factors, including "no responsibility acceptance, no remorse, blaming others or flat denial." R. 182, PageID 2021–22. The district court also acknowledged the seriousness of Kelly's crimes and the importance of deterring others from

abusing government relief programs. Finally, it cited Judiciary Sentencing Information (JSIN) data, which shows that wire-fraud defendants tend to receive somewhat lower sentences on average. But the district court also found that Kelly's advisory Guidelines range of 46 to 57 months is by no means aberrant, particularly given aggravating factors like obstructing justice through perjured testimony and using sophisticated means to commit her crimes.

Kelly argues that the district court did not place adequate weight on her minimal criminal history and record of community service. She also argues the district court overemphasized the loss amount. In essence, her argument is a critique of how the district court balanced the relevant factors. But absent evidence of arbitrariness, a mere "assertion that the district court should have balanced the § 3553(a) factors differently . . . is simply beyond the scope of this court's appellate review." *United States v. Frei*, 995 F.3d 561, 567–68 (6th Cir. 2021) (citation modified). Thus, we find no abuse of discretion.

**2.**

Neal's challenge fails as well. The district court adequately considered the pertinent § 3553(a) factors. It acknowledged that Neal had no prior criminal record and spoke at length about his good deeds and character. But while Neal's history and personal characteristics weighed in his favor, the district court also emphasized the seriousness of the crimes and the need to deter others from engaging in similar conduct.

Like Kelly, Neal argues that the district court's consideration of his criminal history and community involvement was insufficient. But he does not stop there. Neal also faults the district court for "conflat[ing] all that Kelly Harris knew and did . . . with what [he] knew and did." D. 32 at p.28.

True, the district court stated that Kelly and Neal had "pretty much equivalent culpability." R. 175, PageID 1894. But Neal points to no evidence showing that this conclusion was arbitrary or unreasonable. Moreover, the district court weighed mitigating and aggravating factors with the same individualized care and detail that it brought to Kelly's sentencing. For that reason, Neal's challenge similarly boils down to a mere critique of the district court's balancing of factors— which, again, is simply "beyond the scope" of our review. *See Frei*, 995 F.3d at 567–68.

**III.**

For these reasons, we **AFFIRM** the district court's judgments.